HARTFORD COAL COMPANY et al., Appellees and Cross Appellants, v. J. L. HELSING et al., Appellants.

No. 42791.

■ 

■

■

NOVEMBER 12, 1935.

REHEARING DENIED FEBRUARY 21, 1936.

Clark, Byers, Hutchinson & Garber, for appellants.

Stewart & Reno, for appellees.

HAMILTON, J.—This action involves a controversy over a coal lease. The record is quite voluminous, the abstract containing over 400 pages. We can only refer to the facts briefly. One McIntyre originally owned the lands involved. He leased to one Routson and others the exclusive right to mine and remove coal underlying the lands for a period of twenty years, beginning May 18, 1923. The royalty at first was 15 cents per ton, and was later reduced to 10 cents. The term of this lease was assigned to the Indian Valley Gloss Coal Company, hereinafter referred to as the Valley Company. Defendant J. L. Helsing was one of the incorporators of this company. He later purchased the lands of McIntyre and thus became entitled to the royalty. During the year 1931, the Valley Company leased the mine to one A. J. Tinlin, who operated the same until November of that year, when he abandoned operations because of a fall in one of the mine entries. Some of the members of the plaintiff copartnership were employed in the mine at the time. Defendant J. L. Helsing, acting in his official capacity as secretary of the Valley Company, employed one John Karney and others, some of whom are plaintiffs herein, to clean up the fall. A group of six or eight of these men, including Karney, being out of steady employment, proposed to the officers of the Valley Company that they take over and operate this mine. They formed a kind of miners' copartnership and, to meet legal requirements, elected Karney as manager or foreman. The verbal agreement or understanding was that when any member of the partnership dropped out, he had no further interest in the partnership business. Plaintiffs were to have the use of the mine equipment and pay a royalty of 25 cents per ton for all coal removed. They commenced work November 9, 1931, and later a written lease was entered into between the plaintiff partnership and the Valley Company. The first draft of contract contained a reservation giving the lessor the privilege of operating a strip mine. This was rejected by the plaintiffs and another contract was prepared, omitting any reference to strip mining privileges.

It is a fair inference from the testimony that at the beginning the operation of this mine was more or less an uncertain

venture. One man had tried and abandoned the effort on account of a fall or cavein of the roof of one of the entries. These miners were out of work and undertook to create a job for themselves. They were used to hard work and with the fortitude and courage typical of the average coal miner, they were willing to try again. The venture was to be for the mutual benefit of both parties. The first efforts toward the north were futile and had to be abandoned. Helsing, it seemed, had been told there was still some coal toward the north. When it was discovered there was none, he excused himself by saying he had been misinformed and encouraged the men to try south, saying that he thought they could still make good there. He showed his sportsmanship and spirit of coöperation by waiving all royalties due prior to January 1, 1932, which perhaps did not amount to a very large sum because not much coal was hoisted, but it no doubt helped out these plaintiffs as they were without capital.

They worked on without any written contract until May 12, 1932, when a contract was entered into between the Indian Valley Gloss Coal Company by V. T. McCall, vice president, by J. L. Helsing, secretary, lessor, whereby it leased to the Hartford Coal Company, a copartnership, consisting of John Karney, M. Templeton, S. Evans, George Cooper, C. Blake, H. Simpson, Tom Lewis, D. Contri, lessees, all property of said lessor, including tipple, all mining machinery, equipment of every kind and nature used and necessary for mining operation at its mine near Hartford, Iowa, including the following described leaseholds belonging to the lessor, to wit (here follows a description of real estate). Lessees agreed to pay the lessor the sum of 25 cents per ton mine run for all coal hoisted. Any additional machinery or equipment purchased by lessees for working the mine was to remain the property of the lessees with the right of removal at the expiration of the lease. Any replacement of existing machinery during the term was at the expiration of the lease to remain on the premises as the property of the lessor. The lease contained a covenant against incumbrances, except a judgment of $2,050 which lessor agreed to satisfy. There was also a provision in the lease that should lessor for any reason beyond its control lose possession or control of the property, that the lease might be canceled without recourse, or in event it became necessary or advisable for lessor to sell the property during the term of the lease, the lease might be canceled, lessees

in that event to be recompensed for the actual net cost of the improvements of a permanent nature, any changes from present operations, or any new locations of shafts to have the approval of lessor. The lease was for a period of five years from April 1, 1932, and was binding on successors and assigns of all parties.

It seems Helsing, as the owner of the real estate, had not fully given up in his own mind the idea of strip mining in some of this territory covered by this lease, and despite the fact that plaintiffs had rejected a lease containing strip mining reservations, we find that as early as June, 1932, Helsing began negotiations for sale of the coal suitable for strip mining and continued these negotiations up to September, 1932. There is evidence that an agreement was actually entered into with one Mr. Cunningham, an engineer and coal operator of twenty-five years' experience in various states, for a sale of the strip coal rights for the sum of $100,000, but this finally failed of ultimate consummation because of a disagreement over the method of payment, but it went so far that the prospective purchaser employed a man to drill. He commenced drilling July 21, 1932, and drilled six holes. Records of the drillings were furnished to Mr. Helsing, owner of the land, and the University Avenue Coal Company of Des Moines, working with the prospective purchaser, Cunningham. Mr. V. T. McCall, who was a stockholder in the Valley Company, went with the driller, showing him where to drill. Later he drilled 55 holes in all, and was paid for his work by Mr. Helsing. He found what he called a nice piece of strippable coal. The thickness of the vein was about four feet. It was the same vein of coal as that being taken out by the shaft mine by the plaintiffs under their lease. The negotiations with these parties ended about September, 1932.

During the negotiations, the fact that plaintiffs had a lease covering these premises was mentioned, and Cunningham asked Helsing if he made a deal what would be done with the operation of the shaft mine. Helsing said that he would not have to worry about that because he would take care of any claims out of the proceeds of the deal, but that it would help materially if the new company, provided they made a deal, would give the six of them (members of plaintiff partnership) jobs. In this conversation Helsing said that if any serious objections or difficulty arose which could not be worked out, the Valley Company could be thrown into bankruptcy and the lease wiped out.

Helsing did not remember making this statement, but admitted that something might have been said about bankruptcy, as the company was actually in bankruptcy during part of the time the negotiations were being carried on.

An involuntary petition in bankruptcy was actually filed September 2, 1932, by three small creditors whose claims were less than $1,000. From an examination of the bankruptcy proceedings, it would appear that Helsing knew whereof he spoke when he said that the company could be thrown into bankruptcy, because the schedule filed showed assets of $9,500.85, and liabilities of $194,080.27. Of this amount $50,000 represented a secured claim of Iowa Pure Iron Company, of which J. L. Helsing was president, a general claim of the same company of $89,316.-92, a personal claim of J. L. Helsing of $23,763.20, a claim of two of the other Helsings of more than $13,000, or a total of over $175,000 under the control of the defendants Helsing. It should be noted in passing that with the exception of one item, none of this indebtedness against the Valley Company was mentioned to plaintiffs. There was a $2,050 judgment lien referred to in the lease, which the lessor agreed to pay and which plaintiffs were led to believe was the only indebtedness against this Valley Company at the time they entered into the lease. As a matter of fact, a $50,000 chattel mortgage was placed on this company's chattels on March 17, 1932, by Mr. Helsing himself, acting in his official capacity for the company. We set these facts out as explanatory of the apparent cocksure attitude of Mr. Helsing and his apparent disregard of the contractual obligation under the five-year lease with the plaintiffs.

Immediately following termination of negotiations with Cunningham, Helsing entered into a contract with some other parties for removing the dirt. This was about the 17th of September, 1932. This was just after the petition of involuntary bankruptcy had been filed, asking that the Valley Company be adjudged a bankrupt, and Mr. Helsing had told the members of the plaintiff partnership that the bankruptcy matter wiped out their lease. It should be noted that Helsing, as secretary of the Valley Company, gave the company's consent to the adjudication of the Valley Company as a bankrupt on November 23, 1932. Actual operation in connection with the strip mine started about the first of January, 1933. The first coal taken out for commercial purposes was during the latter days of March, 1933. A new

partnership, Helsing Bros. Farm & Mine Company, defendant herein, was organized for the purpose of mining this strip coal. This partnership was formed in May, 1933, and was composed of J. L. Helsing and three of his brothers. The assets of the Valley Company were duly appraised and ordered sold by the referee in bankruptcy and were on the 24th day of July, 1933, sold free of liens to one of the defendants, H. B. Helsing, for the sum of $3,750, which included the corporate charter and rights thereunder, but did not include the rights of the Valley Company under the lease with the plaintiff for the co-operative mining of coal. This item was reported by the trustee as worthless and a burdensome asset, and on the 25th of July was by order of the referee in bankruptcy rejected as a burdensome asset.

This action was commenced April 21, 1933. Coal operations continued, both by the plaintiffs through the shaft mine, and by the defendants through the strip mining operation. On the 29th of September, 1933, the plaintiffs were stopped by a fall in one of their main entries. The bankrupt sale, of course, included the mining equipment which had been leased to the plaintiffs and which they had been using in the operation of said mine. After this fall in the mine entry in September, 1933, the plaintiffs pulled their iron tracking and equipment out of the mine. It appears from the evidence that the plaintiffs did not understand what effect the bankruptcy matter would have on their lease. Helsing had told them it would wipe out their lease. Under the lease, the plaintiffs were limited in their coal operations to hoisting the coal by the shaft method and any change in method of operation required the consent of the lessor. It appears from the record that because of the poor roof conditions and water conditions in the mine it was difficult to obtain the coal through underground methods and there had been talk between Helsing and Mr. Karney, the foreman, some time prior to January, 1933, to the effect that the operation through the shaft ought to be wound up during the winter, and that they ought to go down across the creek and start in down there where it would not be so expensive. Karney says: ''That was our intention and I discussed it with the men a number of times and there was no objection. They were in for it. The old mine had been tapped into two or three times and they wanted to leave the expense behind. With the old mine it was a long haul for a small tonnage and in opening up across the creek we could get rid of the

water except what we made ourselves. It would be cheaper to get the coal out and I figured we could work at a profit instead of a loss. I discussed the matter with the men a good many times and they all understood it." However, the mine was not abandoned until the cavein and the bankruptcy matter the following September.

We are inclined to think that the statement of Karney is probably a fair statement of the facts in reference to this matter. There is ample evidence to support the claim that the roof conditions were bad, and that it was a difficult task to operate the mine with any great degree of success. The record shows that as early as August, 1932, there were some negotiations between some of the members of the plaintiff partnership and Helsing with reference to this strip mining proposition. It appears from the evidence that this proposed strip mine location, if carried out, would cut off the entry to a large, valuable portion of the coal field in the southeast portion of the territory, which had not yet been worked, and the evidence shows that the men in the mine were compelled to shift their position and go farther south and were compelled to run these additional entries because of the strip mining project. So the members of the plaintiff partnership, if agreeable terms could be arranged, were willing to make some other and different arrangement. But under the evidence in this record, it cannot be found that there was ever a definite understanding or agreement between the plaintiffs and Helsing, and their negotiations finally terminated in a fall out in November, 1932, and this was prior to the time that the defendants had expended any considerable amount of labor or money in the strip mining operation. The evidence shows that as early as August, 1932, a committee was appointed to see attorneys in reference to the plaintiffs' rights under their lease, and in reference to the usurpation or trespassing of the defendant Helsing in his proposed strip mining operations. There was a meeting between Helsing and the partnership in October and another in November, wherein they attempted to come to some definite understanding, but no agreement was reached, and, on the contrary, they had a complete fall out and disagreement. Matters seem then to have rested in abeyance until this action was commenced in April, 1933.

In the petition and amendments, the plaintiffs asked for a confirmation of their exclusive coal lease rights, for an injunction

against interference therewith, for an accounting, for damages for coal taken out by the landowner and other defendants by strip mine methods, and for reimbursement for permanent improvements made by the plaintiffs, and for general equitable relief. There was a general denial and an allegation that plaintiffs' lease had been canceled and was null and void, and that the bankruptcy of the Indian Valley Gloss Coal Company had divested the plaintiffs of any further rights to mine coal, and by later amendments to the answer defendants alleged an equitable estoppel based on consent or acquiescence of the plaintiff partnership.

The court found and decreed that the acts of the defendant were unlawful and fixed the amount of coal wrongfully mined by defendants at 14,010 tons and awarded plaintiffs a judgment at the rate of 35 cents per ton, or $4,903.50. The court also found and decreed that the plaintiffs' shaft mine was no longer a profitable venture, because of a cavein on September 29, 1933, just before the trial, and that the plaintiffs had abandoned the same as of September 29, 1933, and that this abandonment constituted a termination of their lease. The court further decreed that whatever improvements were made in the shaft mine were of no value to anyone who might desire to operate the mine for the reason that said shaft mine could not be carried on at a profit, and therefore awarded no damages by way of reimbursement for improvements, and for the same reason the court likewise refused any injunctive relief or any other damages or equitable relief of any kind and terminated the leasehold interest of plaintiff Hartford Coal Company, as of date September 29, 1933.

Defendants have appealed from the judgment entered against them. Likewise, the plaintiffs by cross-appeal have appealed from the decree refusing to award them sufficient damages, and from the refusal of the court to reimburse them for improvements placed in the shaft mine, and from the action of the court in refusing to confirm and protect their leasehold rights by injunction for the balance of the term of their lease, and ask that the case be resubmitted for the purpose of taking evidence of coal wrongfully removed subsequent to September, 1933, the time of trial in the court below. In this opinion the defendants will be referred to as appellants and the plaintiffs as appellees.

But two propositions are presented by appellants' argument: First, they contend that the plaintiffs are estopped by

their conduct and acquiescence; second, the plaintiff, being a co-partnership, under the law the acts of one member of the firm, made in the scope of the partnership business, are binding on the firm, and that John Karney was foreman and manager of the partnership, and that the strip mining operations were all carried on with his knowledge and consent and acquiescence, which binds the partnership, and that the defendants have invested large sums of money, and expended time and labor relying upon the consent and acquiescence of the plaintiffs, and that plaintiffs are in equity estopped from claiming any damages of any kind or character from the defendants. They also especially claim that the court erred in rendering judgment against V. T. McCall for the reason that he was not a member of the partnership of Helsing Farm & Mine Company, but was only an employee of said partnership.

■■■ At the outset we will say that we see no excuse under the record for entering judgment against McCall. While he was a stockholder in the Valley Company, that company is wiped out by the bankruptcy proceeding, and while he took an active part from the beginning in all the proceedings in reference to the strip mine project, the evidence clearly shows that he was acting in the capacity of an employee of J. L. Helsing or the Helsing Bros. Coal Company, and as to McCall, on the appeal of the defendants, the case must be reversed.

■■■ The doctrine of estoppel in pais is well defined by our own decisions. In the case of Beechley v. Beechley, 134 Iowa 75, at page 76, 108 N. W. 762, 765, 9 L. R. A. (N. S.) 955, 120 Am. St. Rep. 412, 13 Ann. Cas. 101, this court said:

"But an estoppel in pais is based on fraud, and the conduct relied upon to establish it must be such as amounts to fraud, actual or constructive. There must be deception, and change of conduct in consequence thereof." See, also, Brauch v. Freking, 219 Iowa 556, 258 N. W. 892, 895.

"Where a person has, with knowledge of the facts, acted or conducted himself in a particular manner, or asserted a particular claim, title, or right, he can not afterward assume a position inconsistent with such act, claim, or conduct to the prejudice of another who has acted in reliance on such conduct or representations. It is upon this just and equitable principle that a person is said to be estopped to take advantage of his own fraud or wrong." 21 C. J. 1202.

There can be no estoppel under this record unless it is based upon the consent given by Mr. Karney, and before he could give his consent, it must be shown that what he did was within the scope of the business of the partnership. It is well settled in this state that one partner has no authority to execute an assignment of the property for the firm unless his co-partner be absent so that he cannot be consulted or is incapable from some cause of expressing assent or dissent. Loeb v. Pierpoint and Tuttle, 58 Iowa 469, 12 N. W. 544, 43 Am. St. Rep. 122; Hunter v. Waynick et al., 67 Iowa 555, 25 N. W. 776. It is true, as a rule, that each partner is authorized to act for and in the name of the firm, yet his power to do so is limited to matters within the scope and ordinary business transactions and purposes of the copartnership. Brewster v. Reel, 74 Iowa 506, at page 508, 38 N. W. 381; Boardman & Gray v. Adams & Hackley, 5 Iowa 224, at page 229.

The business of this copartnership was that of mining and disposing of coal taken out of the mine. There is nothing in the evidence from which it can be inferred that the relinquishment of the rights under the lease to a large quantity of the coal to the landowner without any definite agreement as to terms, which in effect in a large measure interfered with the carrying on of the very business of the partnership, was within the scope of the business of said partnership. There is not a particle of evidence that this partnership was engaged in the business of purchasing leases and reselling them. The partnership was composed of a few coal miners, not operators. They were out of work and took this method of making for themselves a job to support their families, and this member of the partnership certainly had no authority to grant to the landowner a privilege which had first been incorporated in the lease six or eight months before, and which the members of the partnership had rejected. This transaction was so far outside of the scope and ordinary business transactions and purposes of the partnership as to cast the burden upon the defendant to establish that it was by and with the consent of the other members of the firm, and this the evidence falls far short of establishing. In fact, the evidence shows exactly the contrary. The evidence shows that as early as August, 1932, at the time Helsing first began in a small way to strip some of the dirt, and at the very time, as he now claims, Karney consented, Karney told Helsing that the other boys were opposed to it. They held meetings with Helsing

on two or three occasions from August to November, at which they tried to obtain some definite agreement or understanding with him in reference to this strip mining proposition, and at the last meeting in November, when they were pressing him for a definite proposition, he said: "I can't give you any new proposition. This is my land down here and I will do as I damn please with it." He said he could not make any proposition, that this property was all tied up in the bankruptcy court.

Karney testified as defendant's own witness: "I wanted to know whether we were going to have a slope or whether there would be a strip mine and what it was all about. Mr. Helsing said: 'It is in bankruptcy in court. I don't know what the outcome will be, but I will guarantee you if you will cooperate with me that it will be as good or better than it is now for you.' Cooper (one of the members of the firm) then said to Helsing: 'If you haven't got a proposition, then I've got a proposition,' and they both got pretty loud and it wound up so there was nothing further said. The meeting adjourned and nobody was feeling extra good." Helsing in his own testimony said that he told the plaintiffs that he owned the farm and that the Valley Company was through and that their lease was wiped out. Karney testified further: "Late in November, after the stripping operations started, everybody was up in the air and there was quite a bit of hollering going on, and I said, 'If you don't want them to strip, why don't you put an injunction on them' and they designated me as one of the men to see some attorney, and I believe Cooper and Blake were designated with me, but I did not go. I think Cooper and Blake did."

It would serve no useful purpose to pursue this matter further in setting out the testimony. The sum and substance of the whole matter is that Karney did give his individual consent so far as he was concerned, but at the same time the other members, most of them, were protesting, demanding a definite proposition, and these protests continued.

■■■ Furthermore, it is plain from the evidence that defendants were not induced to act because of anything said or done by plaintiffs. Mr. Helsing proceeded on his own motion and initiative to attempt at first to sell the entire property, and, later, the coal stripping privileges, without asking any one's consent. He did not claim his acts were with their consent. He said at one time, "They (the plaintiffs) should be taken care of,"

and again he said, "I can take care of them out of the money I receive from the sale. If serious difficulty is encountered and they will not yield, we can throw the company into bankruptcy and wipe out this lease." Does this talk sound like Helsing had plaintiffs' consent to go ahead? The evident fact is that because of the advantageous position occupied by him in his various capacities, he assumed that it was possible, either by persuasion or legal force, to compel an agreement to terms satisfactory to himself, and proceeded accordingly. Subsequent events proved that he was mistaken in his assumption, and he now seeks to avoid liability by plea of estoppel. Defendants' outlay of money and expense was largely made after Mr. Helsing had definite knowledge that the members of plaintiff partnership were not willing for him to go ahead without some definite proposition, and the work of removing the coal was long after he had emphatically refused to make a definite proposition and there had been a complete disagreement. Finally attorneys were employed and this lawsuit was started. We find no merit in appellants' contention.

■■■ It is the further contention of appellants that there is no evidence that the defendants made any profit out of the strip mining proposition, and there was no evidence upon which the court could base its finding that the plaintiffs were entitled to judgment for the amount allowed. Proper measure of damages is not the profit made by the defendants, but the loss or damage sustained by the plaintiffs. This coal taken out by the defendants was part of the same vein of coal which was being removed by shaft methods by the plaintiffs. In the case of Chamberlain v. Collinson, 45 Iowa 429, this court said:

"The mineral raised by the plaintiff was taken from his own ground. * * * The defendants are seeking to recover, not the mineral, but damages. Now, the damages which they have sustained arose from the fact of their being deprived of the full benefit of their lease. They have been prevented from mining mineral which they had a right to mine. The question then is, what is the value of the right of which they have been deprived? It is, evidently, the value of the mineral unmined, or what is the same thing, the value of it mined less the reasonable cost of mining it." See, also, Hartford Iron Mining Co. v. Cambria Mining Co., 93 Mich. 90, 53 N. W. 4, 32 Am. St. Rep. 488, a Michigan case.

There is ample support in the evidence for the basis of 35 cents per ton for the coal actually taken. On the appellants' appeal the case must be affirmed, except as to V. T. McCall.

■■■ The questions presented by the cross-appeal of the plaintiffs are quite complicated, a solution of which has caused the court no little difficulty. In the first place, by the discharge in bankruptcy, plaintiffs' lessor lost its legal entity. By the sale to one of the defendants of the mining equipment covered by the lease, together with the corporate charter of the Valley Company, and all rights thereunder, except the co-operative coal mining right under the lease, which right was rejected as a burdensome asset, the plaintiffs were left with no intermediate lessor with whom to negotiate in reference to any change in the method of operation of the mine, and while, under the original McIntyre lease, "the exclusive right to remove coal" was granted, on the other hand, by the terms of the Valley Company lease, they were tied down to a particular system or method, that is, through the shaft, and no change was possible without the consent of lessor. The rights of McIntyre are now held by the defendant J. L. Helsing, and whatever rights, if any, of the Valley Company are left in existence, are now held by the defendant H. B. Helsing, as purchaser at the bankruptcy sale. And while the trustee in bankruptcy testified that the sale was made subject to any valid subsisting contractual rights, the order of sale, on its face, is absolute and free of liens. Then there is the question of whether or not the mine is capable of being operated at a profit by the shaft method; whether the plaintiffs had in fact abandoned the lease; the question of how much, if any, the strip mining interfered with the possibility of the continuation of the mining of coal through the shaft by the plaintiffs; and the question of the rights of the plaintiffs to compensation for improvements—these, with other propositions which we might mention, present a rather complicated problem. In both the petition and the answer of the defendants we find a prayer for general equitable relief, which gives to the court broad power and authority in dealing with these complicated matters.

We have carefully considered all the matters presented by the plaintiffs' cross-appeal, and with one exception are satisfied that the results reached by the trial court are fair and equitable and not in contravention of any principle of law. The lower court allowed the plaintiffs nothing for permanent improve-

ments, and in this respect we are constrained to believe the court was in error. It should be borne in mind that all the parties at the very beginning recognized serious difficulty in operating this mine through the shaft, and that it would require a lot of timber work. This extra timbering in the mine was undertaken by plaintiffs on the strength of a five-year lease. McCall himself testified: "I said to Karney that it would be necessary to timber the road ways and Karney said that they wouldn't want to put in any extra money into timbering until they had a lease, but now that they had one, they would go ahead and timber it right away." The first entry they started was in a southeasterly direction, directly in the path of this strip mine project which had not yet been started. It is true that there is some quite convincing testimony in the record given by the man who drilled the holes in prospecting for strippable coal, to the effect that the roof conditions were poor over this coal. There is other testimony to the general bad condition of the roof and water conditions of the mine throughout, but the physical facts are that these plaintiffs were actually mining coal and by timbering, the evidence shows, could have continued to mine coal.

The defendants, by reason of their strip mining operation, contributed to some degree at least in rendering it impossible to successfully operate the shaft mine. The preponderance of the evidence clearly shows that this stripping operation cut off a large sector of the coal, access to which was possible, and which, but for the cutting off of the entry by the strip mining process, could have been taken by the shaft mine, the same as the other coal had been mined and taken through the shaft, and with the same probable degree of success. Therefore, when defendants urge that plaintiffs are not entitled to anything for improvements because they are of no value to any person who might want to operate the mine, for the reason that in its present condition it cannot be operated with a profit, they are profiting, to some extent, by their own wrong, and in equity should not be permitted to so profit. McCall testified that at the last meeting between Helsing, himself, and Cunningham, there was some talk of taking care of plaintiffs for permanent improvements, which indicates that they themselves recognized that there were some such improvements. The first few weeks of the work was almost entirely devoted to laying permanent entries at a large outlay of money

and expense of labor. Some thirty laborers were employed, besides the members of the partnership. It may fairly be stated that, as shown by the record, the representatives of the Valley Company, Mr. McCall and Mr. Helsing, knew the roofing of this mine was not such as to permit the mining of the coal without extraordinary difficulty and precaution. They knew this when they entered into the lease, before the men constituting the plaintiff partnership even started to work. The five-year lease was entered into at the special request of the plaintiff partnership, because all parties knew that it would require considerable labor to get the mine in shape to work successfully, and that a short-term lease would not be fair to the plaintiffs.

With this as a background, the plaintiffs went to work and the evidence shows that they constructed haulage ways of around a thousand feet, other entries equipped with track and other equipment aggregating around 800 yards in 1932, 671 yards in 1933. There is evidence that the plaintiffs were forced to change their plan when the stripping cut them off in the direction they were going, and then they did a lot of extra work toward the south in order to get around the strip mine shaft. The undisputed evidence in the record is that the reasonable cost of main entries made by plaintiffs is in the neighborhood of $12,000. In addition to this, they constructed an air shaft at a cost of around $500. It is true that these improvements were paid for from coal that was taken from the mine, but it is also true that it cut down their profits during the months that were required to put in this extraordinary expense preparatory to taking out a greater quantity of coal in the later years of the lease. When the fall or cave-in occurred the 29th of September, they were hoisting about 50 tons of coal daily. During the period from April to August, 1933, 5,043 tons of coal were hoisted by plaintiffs and they were contemplating much better results than this at the time the cave-in occurred.

It should be kept in mind that long prior to the time of this cave-in, the defendant Helsing was negotiating with Cunningham and other parties for sale of coal that could be strip mined, which he valued at $100,000 or more. He was carrying on these negotiations, apparently sure of his position that in one way or another, by bankruptcy, if in no other way, he could wipe out this lease and force the plaintiffs to deal with the prospective purchaser or himself on some other terms. He went ahead, and, as

he now claims, expended large sums of money in equipment and machinery preparatory to operating the strip mining project. He continued his operations under the alluring promise that the plaintiffs would be taken care of and be given a better deal than they had; yet when the showdown came and they demanded to know on what terms they were to be taken in, he refused flatly, told them they had no rights, that the bankruptcy matter wiped out their lease, and that the farm was his and he would do as he pleased with it.

One may not come into a court of equity and submit himself to the jurisdiction of such a court and ask relief which amounts to his profiting by his own wrong. We are abidingly satisfied in our own minds that the decree of the court does not go far enough; that it is unjust, unfair, inequitable, and unconscionable to permit the defendants to go unpunished in damages for the part they played in rendering a large portion of the territory covered by the lease inaccessible to mining operations by the shaft mine. They should reimburse the plaintiffs in a sum that is fair and reasonable. The determination of this is a difficult matter. It can only be approximated. The very coal that is being taken out by the strip method is the same vein of coal that would have been taken out by the shaft method under plaintiffs' lease, and other coal beyond this could have been likewise taken. Defendants placed their own estimate on the value of the profits from this strip mining operation at at least $100,000. The evidence shows that these few hard working miners without capital paid for all this expensive entry work, paid their royalties and made a profit besides—not at all times the full wage scale of miners, but they made a living besides paying all their bills in operating the mine and had the mine in a condition to go on when the cavein occurred. That this fall or cavein was due to some extent to the damming up of the creek by dirt from the stripping and the creation of a pond of water immediately over the place the fall occurred has support in the testimony.

Viewing the catastrophe, partly because of the cavein, and partly because of what the defendants had done and were continuing to do in cutting off a part of the coal field and creating a worse water condition, and because of the bankruptcy matter, the plaintiffs pulled their tools and to all intents and purposes apparently made up their minds to abandon further operation

at this shaft. To say that this was a voluntary abandonment, and that the mine would have been abandoned regardless of the strip mining operation and the injury done thereby to the shaft mining project, is an unwarranted conclusion. There is nothing in the record to show that the plaintiffs actually formally abandoned the lease. The evidence shows that they had abandoned the shaft mine through which they had been operating, and the reasonable inference to be drawn is that this in effect was an abandonment of the lease, and even should the court find that it did not amount to an abandonment of the lease, events have so shaped themselves at this time that to confirm the lease and send the parties back to deal with each other in view of the various provisions in the lease which require the co-operation and consent of the lessor, who no longer exists as a legal entity— the lessor now being, if one exists at all, the purchaser of the corporate charter and the relative rights, the purchaser being one of the defendants to this litigation, and the owner of the land another defendant—the prospect of possible solution would not appear to be very bright; and since the matter is in a court of equity with both parties asking for general equitable relief, the most fair, equitable, and reasonable approach is by means of recompense in the way of damages, and the winding up of the relationship between the parties by terminating the lease.

It is the judgment of this court that the plaintiffs-appellees should have been allowed the additional sum of $4,000 as damages, as a fair and reasonable apportionment of the loss for labor and money expended on permanent improvements, which would have been of use and value to some other person or to these plaintiffs but for the interference of the defendants by their strip mining operation and wrongful interference with the plaintiffs' rights under their lease.

We take time to admonish attorneys to keep in mind the rules of this court in preparing briefs and arguments. While no assignment of errors is necessary in an equity case involving questions of fact, yet it is necessary in the statement of facts and argument, "* * * when referring to fact propositions, he shall refer to the *pages and lines* of the abstract where the same may be found." Old Rule 31-b, sub. f. Also see same rule at page 7 of Amendment to and Revision of Rules. Attorneys for plaintiffs-appellees did observe this requirement, but the same was

1028

overlooked by appellants' counsel, and with a 400-page abstract, this oversight added materially to our labors.

It therefore follows that on appellants' appeal the case is affirmed, except as to V. T. McCall. On the plaintiffs-appellees' appeal, the case is reversed and remanded with instructions to enter a decree in accordance with the findings of this court.

Affirmed in part and reversed in part on defendants' appeal. Reversed and remanded with instructions on plaintiffs' appeal.

KINTZINGER, C. J., and DONEGAN, ANDERSON, POWERS, ALBERT, and MITCHELL, JJ., concur.