423 F.2d 638
 ASOCIACION DE AZUCAREROS DE GUATEMALA 4a. Av. 14-53(1) Guatemala City, Guatemala, Plaintiff-Appellee,
v.
UNITED STATES NATIONAL BANK OF OREGON, PORTLAND, OREGON, Defendant-Appellant.
 No. 22693.
 United States Court of Appeals, Ninth Circuit.
 February 18, 1970.
 
 Howard M. Feuerstein (argued), Clarence R. Wicks, Robert D. Geddes, of Davies, Biggs, Strayer, Stoel & Boley, Portland, Or., for appellant.
 Clifford Carlsen (argued), of King, Miller, Anderson, Nash & Yerke, Portland, Or., William D. Rogers, of Arnold & Porter, Washington, D. C., for appellee.
 Before MERRILL and DUNIWAY, Circuit Judges, and BURKE, District Judge.*
 MERRILL, Circuit Judge:
 
 
 1
 By this diversity action appellee Association seeks recovery of sums allegedly due under an irrevocable letter of credit issued by appellant Bank. From judgment in favor of the Association the Bank has taken this appeal.
 
 
 2
 On June 7, 1966, the Bank issued an Irrevocable Commercial Letter of Credit to the Association. The letter related to a shipment of sugar sold by the Association to one Greenberg and consigned to him. By the letter the Bank agreed to pay 90 per cent[1] of the invoice value of the sugar upon presentation of documents evidencing August shipment of "5,000 Long Tons * * * more or less, Guatemalan Bulk Raw Centrifugal Sugar of the 1965/66 Crop, F.O.B. Stowed Guatemalan port/ports, basis 96 degrees minimum polarization."[2]
 
 
 3
 On August 15, 1966, the Association shipped the sugar on the S. S. Gardenia and immediately dispatched the shipping documents to the Bank. The documents evidenced shipment in accordance with the requirements of the letter of credit.
 
 
 4
 Greenberg had arranged for resale of the sugar and a back-to-back letter of credit had been issued in his favor (with the Bank acting on his behalf) by J. Henry Schroder Banking Corp., acting for the ultimate purchaser. Accordingly when the Bank received the shipping documents from the Association it forwarded them to Schroder Corp. On August 26th it received payment in full from Schroder on the back-to-back letter of credit.
 
 
 5
 The sugar arrived and was unloaded at Gramercy, Louisiana, on August 24th.
 
 * The Misrepresentation Issue
 
 6
 On August 26th Greenberg advised the Bank that the sugar on testing failed to meet contract standards; that he had so advised the Association and that the Association had agreed to modify the letter of credit to provide payment of 75 per cent rather than 90 per cent of the invoice value. Greenberg asked the Bank to cable the Association's representative to the effect that polarization was "below credit requirements" and to ask authorization to modify the letter of credit. The Bank accepted Greenberg's representations without verification and cabled the Association as requested. The Association read the cable as a representation that the sugar polarized below 94 degrees. In fact, the shipment's polarization averaged out at 95.176358 degrees, well within the trade's definitional standard.
 
 
 7
 Upon receipt of the Bank's cable the Association agreed to reduce the letter of credit from 90 per cent to 75 per cent. The Bank paid the Association the reduced amount out of the Schroder payment. It retained $75,000 to apply against debts of Greenberg to the Bank. The balance was turned over to Greenberg, who subsequently dissipated most of it.
 
 
 8
 The District Court found that the Bank's cable was a false statement upon which the Association relied in agreeing to modification of the letter of credit; that this misrepresentation entitled the Association to rescission of its agreement to reduce the letter of credit from 90 per cent to 75 per cent and accordingly that the Bank remained obligated in accordance with the terms of the original letter.
 
 
 9
 The court granted judgment in favor of the Association for the difference between 75 per cent and 90 per cent of the invoice value — $55,866.38 plus interest.[3]
 
 
 10
 The Bank contends that the delivery of sugar "basis 96 degrees minimum polarization" was a credit requirement and since the sugar polarized at less than 96 degrees, the cable was not false. The Bank further asserts that there was no proof that it was familiar with trade usage or the New York Coffee & Sugar Exchange By-Laws with reference to the use of 96 degrees as a bench-mark for the assessment of premiums and penalties for sugar polarizing between 94 degrees and 98 degrees.
 
 
 11
 We agree with the District Court's decision that the use of the word "minimum" was a superfluity. As explained earlier (f.n. 2), "raw sugar" is defined as sugar polarizing between 94 degrees and 98 degrees. The letter of credit itself specified the delivery of "raw sugar." Moreover, neither the underlying contract nor the back-to-back letter of credit used the term minimum, but only referred to raw sugar, basis 96 degrees polarization. If the letter of credit is to be read as the Bank suggests — that it covered only sugar polarizing above 96 degrees — it would have been a radical departure from trade practice and inconsistent with the underlying contract and the Schroder letter. Inasmuch as the Bank was dealing with rather large sums of money in this transaction, it is not onerous to hold that it, as writer of the letter, should have known (if necessary, by making inquiries as to the meaning of its letter of credit) that sugar polarizing at 95 degrees was "raw sugar" within the meaning of its letter.[4] The Bank therefore should have known that the Association would reasonably take its statement that the sugar was polarizing below credit requirement to mean that the sugar was polarizing below 94 degrees. Since the sugar was in fact polarizing well above that figure, the cable misrepresented the truth. See: Restatement of Contracts, § 470 (1932).
 
 
 12
 We find no error in the court's finding of misrepresentation.
 
 II
 
 The Release Issue
 
 
 13
 The present suit was brought by the Association against both the Bank and Greenberg. Its claims against the latter were not confined to the Gardenia shipment but included claims on other unrelated transactions. Greenberg counterclaimed for a variety of matters, mostly unrelated to the Gardenia shipment.
 
 
 14
 The Association proposed that its claim against the Bank be tried first, feeling that recovery against the Bank might eliminate the need for dealing with the remaining issues in light of Greenberg's shaky financial condition. The Bank had no objection and the case proceeded in that fashion. The Bank entered into a stipulation with Greenberg for entry of judgment against him for the amount of any judgment obtained by the Association against the Bank.
 
 
 15
 The court's opinion granting judgment against the Bank was announced October 27, 1967. On October 28 a mutual release of claims was entered into between the Association and Greenberg and a stipulation for dismissal of issues between those parties was filed October 30. In its release of its claims against Greenberg the Association did not expressly reserve its claims against the Bank.
 
 
 16
 After judgment was entered against it, the Bank moved to set judgment aside on the ground that the Association's release of Greenberg also served to release the Bank on its liability under the letter of credit. The court heard argument, considered affidavits of counsel and denied the motion. The Bank assigns this as error.
 
 
 17
 The Bank likens its positions to that of a surety or gurantor. In this it is mistaken. A surety is generally not liable on his undertaking unless his principal is liable and in default on the underlying debt. The defenses of the principal are available to the surety and, if the underlying debt is canceled, the surety's obligation ceases. See: Restatement of Security, § 122 (1941).
 
 
 18
 The letter of credit, unlike the classic surety undertaking, is a primary obligation between the issuer and the beneficiary. Uniform Commercial Code, § 5-114(1), comment 1. The agreement, as here, is to pay on presentation of shipping documents and may well arise even before the buyer receives the goods. The issuer is not concerned with the state of affairs between the buyer and seller. He is concerned only with the evidence of shipment and is bound to honor his promise "regardless of whether the goods or documents conform to the underlying contract for sale or other contract between the customer and the beneficiary." Ore.Rev.Stat. 75.1140(1); Uniform Commercial Code, § 5-114(1). See Dulien Steel Prod. Inc. of Wash. v. Bankers Trust Co., 298 F.2d 836 (2d Cir.1962). If it were otherwise, letters of credit could not safely be honored until after delivery of the goods. No issuer could safely accept the risk of paying against documents. The unique commercial usefulness of the letter of credit as a vehicle of rapid and guaranteed payment in commercial transactions would be destroyed. See: Hershey, Letters of Credit, 32 Harv.L.Rev. 1, 14 (1918).
 
 
 19
 The Uniform Commercial Code, § 5-106(2), provides that "once an irrevocable credit is established as regards * * * the beneficiary it can be modified or revoked only with his consent." Ore.Rev.Stat. § 75.1060(2). In the interests of certainty and stability, we hold that any modification or revocation of the underlying agreement between buyer and seller (or of the rights of the parties springing from it) cannot be permitted to affect the letter of credit unless the beneficiary explicitly consents to the alteration or revocation of the letter. The mutual release between Greenberg and the Association did not contain the consent of the Association to a revocation of the letter of credit.
 
 
 20
 The Bank also contends that the Association's settlement with Greenberg amounted to payment of all his obligations to the Association, including his obligation respecting the Gardenia shipment. It asserts that as matter of law this paid the underlying debt and that compliance with the judgment would amount to double payment for the seller. See Ore.Rev.Stat. 75.1150(1).
 
 
 21
 We cannot agree. To hold that the release accomplished payment to the Association as matter of law is to hold, under a different guise, that the release of Greenberg released the Bank — a proposition we have just rejected.
 
 
 22
 The question of payment, then, remains one of fact; did the parties intend (and did their minds meet in agreement) that by the settlement with Greenberg the underlying Gardenia debt was paid and judgment against the Bank was satisfied?
 
 
 23
 It is clear from the record that such was not the fact. The implicit finding of the District Court to this effect must be upheld.
 
 
 24
 Judgment affirmed.
 
 
 
 Notes:
 
 
 *
 Honorable Lloyd H. Burke, United States District Judge for the Northern District of California, sitting by designation
 
 
 [1]
 Originally the letter provided for payment of 95 per cent of the invoice value. Later this was reduced to 90 per cent
 
 
 [2]
 "Polarization," as explained in the trial testimony, has reference to the purity or polarity of sugar. In the international sugar trade to constitute "raw sugar" the product must polarize between 94 and 98 degrees. Polarization thus serves a definitional purpose. It also serves, by trade custom, to provide a basis for adjustment of sale price in accordance with the purity of the sugar delivered. "Basis 96 degree polarization" has reference to 96 degrees as the standard of purity for the agreed sale price. Sugar polarizing at lower than 96 degrees is subject to penalties or deductions from the agreed price. Sugar polarizing at higher than 96 degrees is subject to premiums. Penalties and premiums are established by the By-Laws of the New York Coffee & Sugar Exchange
 
 
 [3]
 We need not concern ourselves with the remainder of the trial court judgment, which totalled $250,135.20, except to say that it arose out of a parallel transaction involving Greenberg. It is relevant here only because the release, discussed hereafter, is claimed to relieve the Bank of liability for the whole judgment; the only part of the judgment otherwise attacked is the $55,866.38 mentioned above
 
 
 [4]
 In addition, we note that the shipping documents, as printed forms, did not contain polarization information and were completed before the sugar arrived in the United States, suggesting that the giving of such information was not common in the trade. The Bank had already received payment on the back-to-back letter of credit. If the Bank in truth was unfamiliar with the practices of the sugar trade, and was issuing letters of credit it did not understand, it at least had received real assurance (or warning) from Schroder that the documents were in order and that it need not concern itself with the specific facts of polarization