Beryle L. JOHNSTON et al., Appellants,

v.

The STATE BANK, Appellee.

No. 54752.

Supreme Court of Iowa.

Feb. 25, 1972.

Kersten, Opheim & Estes, Fort Dodge, for appellants.

Hamilton & Schill, Fort Dodge, and Alan Loth, San Jose, Cal., for appellee.

UHLENHOPP, Justice.

This appeal turns on whether a letter from a bank, notifying a contractor that the bank had made a loan commitment to certain customers, constituted a "letter of credit."

Mr. and Mrs. Dale G. Trier desired to build a house in Fort Dodge, Iowa. They saw some plans in a magazine for a two-story house. They talked with Beryle L. Johnston, an experienced contractor. He obtained the house plans from the magazine. The plans showed that the ground floor of the house contained 864 square feet.

Triers selected a lot in a housing development and relied on Johnston to comply with building restrictions and permits. Johnston was familiar with such things, having had difficulty with restrictions on a nearby lot in the same development two years before.

Johnston obtained an abstract of title to the lot. The abstract contained an entry showing this restriction on the lots in the development:

> In any case no dwelling shall be permitted on any lot described herein, having a ground floor square foot area of less than 1,200 square feet in the case of a one structure [sic], nor less than 1,000 square feet in the case of a one and one-half or two story structure, exclusive of porches, porticos, entrance ways, airways or garages.

Johnston purchased the lot. The deed to him was "subject to building restrictions, easements and zoning ordinances of record."

Triers entered into a written contract with Johnston for the purchase of the completed house and the lot. Johnston agreed in the contract to furnish "abstract showing marketable title."

Johnston needed a construction loan. He could obtain one through his lumber supplier provided Triers could secure a commitment for a permanent loan. At Johnston's suggestion, Triers sought a loan. They inquired at The State Bank, where they submitted the house plans and their contract with Johnston. The Bank agreed to make them a loan on a first mortgage upon Johnston's completing the house and upon Triers' furnishing the Bank with an abstract showing merchantable title. At the request of Johnston and for his use in obtaining his construction loan, the Bank provided him with a letter stating:

> It is our understanding that you are constructing a new home at the above address for Mr. Dale G. Trier.

Please be advised that we have committed to Mr. Trier for real estate mortgage loan in the amount of $22,850.00 subject to our holding a first and paramount lien on this property. The home is to be constructed as per plans and specifications submitted. The house is to be completed and ready for occupancy prior to this bank's placing a mortgage against this property.

Armed with this letter, Johnston obtained the construction loan. He then built the house.

Preparatory to Johnston's conveying to Triers, Triers' mortgaging to the Bank, and the Bank's paying off Johnston's lender, Johnston had the abstract brought up to date. The Bank's title examiner noted the violation of the building restriction relating to a ground floor of 1,000 square feet.

Johnston, Triers, and the Bank tried to obviate the title objection. The Bank offered to lend additional funds so that a room could be added and the square footage thus enlarged, but Triers would not agree because of the change in the appearance of the house. Johnston tried to get the lot owners in the development to waive the violation. The owners of one lot refused and consulted counsel, who wrote a letter demanding compliance with the restriction. In this state of affairs, the Bank refused to make the loan to Triers.

Triers and Johnston thereupon commenced the present action against the Bank, based on the Bank's letter notifying Johnston of the loan commitment to Triers. The trial court held for the Bank, and Triers and Johnston appealed. At some point Triers obtained a loan elsewhere and moved into the house. The action has therefore come down to a claim for damages based on the Bank's letter. Moreover, since the Bank's letter was addressed to Johnston, and since, as will be seen, Triers were unable to provide the Bank with marketable title as their agreement with the Bank provided, the case ac-

tually boils down to Johnston's damage claim against the Bank.

We think the appeal requires consideration of two problems: (1) Did the Bank's letter to Johnston create an enforceable obligation? (2) Can Johnston enforce that obligation although the building restriction was violated?

■ I. *The Letter as an Enforceable Obligation.* While we are clear as to what the Bank's letter to Johnston is not, we are not so certain as to just what it is. The letter does not fit neatly into any of the familiar categories. It refers to a commitment by the Bank to lend to Triers, but it is not addressed to them. It does not contain a promise to lend to Johnston, yet he is addressee. Clearly, this letter is not a "take-out agreement" by which a financial institution commits itself to pay off, upon completion of a building, another institution which is providing interim construction financing. See Haggerty, Procedures, Forms and Safeguards in Construction Lending with a Permanent Takeout, 85 Banking L.J. 1035.

■ We believe, nonetheless, that the letter would create an enforceable obligation had Johnston performed for his part. Thus upon completion of the house, had Johnston tendered deed and abstract showing merchantable title, we think he could have compelled the Bank to make the mortgage loan to Triers, if on no other basis than estoppel. This court, quoting an earlier decision, declared in Hartford Coal Co. v. Helsing, 220 Iowa 1010, 1019, 263 N.W. 269, 274:

"Where a person has, with knowledge of the facts, acted or conducted himself in a particular manner, or asserted a particular claim, title, or right, he can not afterward assume a position inconsistent with such act, claim, or conduct to the prejudice of another who has acted in reliance on such conduct or representations."

And this was stated in Seymour v. Ames, 218 Iowa 615, 619, 255 N.W. 874, 876:

> An estoppel is based upon the idea that one who has made a certain representation or taken a certain position, should not thereafter be permitted to change his position to the prejudice of one who has relied thereon.

See also North Side State Bank of Rock Springs, Wyo. v. Schreiber, 219 Iowa 380, 258 N.W. 690; Monona County v. Gray, 200 Iowa 1133, 206 N.W. 26; 28 Am.Jur.2d Estoppel & Waiver § 68 at 694–695; 31 C.J.S. Estoppel §§ 107, 108 at 547–550.

We conclude that Johnston, upon proper performance, could have enforced the Bank's letter.

II. *Effect of Building Restriction Violation.* The building restriction was violated as to the size of the ground floor. What was the effect of this on Johnston's rights against the Bank? Three subsidiary questions are involved on this phase of the case: whether breach of the building restriction rendered the title unmarketable, whether Johnston could enforce the letter if he did nor furnish marketable title, and whether the Bank's letter constituted a "letter of credit."

(a) Johnston's contract with Triers required him to furnish marketable title. The building restriction was violated and one of the neighbors objected to the violation, took counsel, and demanded compliance with the restriction. Was Johnston's title marketable? We think not.

■ Restrictions on the use of land in themselves may render a title unmerchantable. Ft. Dodge, D. M. & S. Ry. v. American Community Stores Corp., 256 Iowa 1344, 131 N.W.2d 515; Annot. 57 A.L.R. 1253, 1301. But no objection to the title on that account is made here. The objection is to the breach of the restriction, to the possibility of litigation flowing from that breach, and to the reduced marketability of the title with that cloud hanging over it. We believe these factors rendered the title unmerchantable. As stated in Holliday v. Arthur, 241 Iowa 1193, 1196–1197, 44 N.W.2d 717, 719:

> When called upon to determine whether an abstract of title shows a merchantable title, unless the specific objections urged to the title have been definitely determined by the courts or are so clear as to not generate a doubt, the court need not pass upon the merits thereof. It is sufficient if the court finds the objections urged, present a doubtful question which may submit the objector to good faith litigation regarding same.

See also Smith v. Huber, 224 Iowa 817, 828, 277 N.W. 557, 563 ("The circumstances in this case are such that an affirmance of the lower court might compel appellant to 'buy a law suit' as well as the land, and this she cannot be required to do."); Annot. 175 A.L.R. 1055, 1060 (violation of restrictions rendering title unmerchantable); 55 Am.Jur. Vendor & Purchaser § 204 at 666–667 (hazard of litigation rendering title unmerchantable); 92 C.J.S. Vendor and Purchaser § 191c at 30–31 (same).

(b) The Bank's letter itself did not tell Johnston in so many words that the Bank's loan commitment to Triers was subject to Johnston's providing Triers with merchantable title and with Triers in turn presenting such a title to the Bank. The letter instead spoke of the Bank's requiring "a first and paramount lien on this property." We will assume without deciding that "a first and paramount lien" does not require a marketable title.

■ Still, underlying the Bank's letter, as all parties were fully aware, was Johnston's contract to provide Triers a marketable title and Triers' succeeding responsibility to present such a title to the Bank. Implicit in the Bank's letter was the assumption that Johnston would perform his contract with Triers properly so that they could carry out their responsibility to the Bank. The breakdown occurred

at the beginning of the chain when Johnston failed to present marketable title to Triers. Johnston is in no position to urge that the Bank is estopped when his own default caused the breakdown. He was the one who from the start had the abstract showing the building restrictions, and he was the one who was relied on for compliance with restrictions and permits. A person whose own conduct or default got him into his predicament cannot successfully urge estoppel. 28 Am.Jur.2d Estoppel & Waiver § 79 at 719; 31 C.J.S. Estoppel § 75 at 452–455.

(c) But Johnston argues that the Bank's letter was technically a "letter of credit" and that a letter of credit is enforceable in spite of default on the part of the addressee in performance of the underlying contract. This is the real basis of Johnston's claim.

██ Johnston is right in his second assertion—that an addressee may enforce a letter of credit despite his breach of the underlying contract. This is the New York rule which is followed generally and is incorporated in the Uniform Commercial Code. Maurice O'Meara Co. v. National Park Bank, 239 N.Y. 386, 396, 146 N.E. 636, 639 ("If the drafts, when presented, were accompanied by the proper documents, then it [the bank] was absolutely bound to make the payment under the letter of credit, irrespective of whether it knew, or had reason to believe, that the paper was not of the tensile strength contracted for."); Banco Espanol de Credito v. State Street Bank & Trust Co., 385 F.2d 230 (1st Cir.); Consolidated Sales Co. v. Bank of Hampton Roads, 193 Va. 307, 68 S.E.2d 652; Code, 1971, § 554.5114(1) ("An issuer must honor a draft or demand for payment which complies with the terms of the relevant credit regardless of whether the goods or documents conform to the underlying contract for sale or other contract between the customer and the beneficiary.").

But Johnston is mistaken in asserting that the Bank's letter here constituted a letter of credit. Neither was the situation one in which letters of credit are typically used nor was the letter itself such a document.

Letters of credit are generally, although not necessarily, instruments of international trade, and they ordinarily involve three parties: a buyer who purchases goods abroad, a foreign seller who sells the goods, and the buyer's bank which furnishes the seller with a letter stating that upon the seller's presenting specified documents, such as shipping papers, the bank will pay the seller. The typical setting and purpose of a letter of credit are described thus in Hibernia Bank & Trust Co. v. J. Aron & Co., Inc., 134 Misc. 18, 21–22, 233 N.Y.S. 486, 490–491:

Commercial letters of credit have come into general use in international sales transactions where much time necessarily elapses between the sale and the receipt by a purchaser of the merchandise, during which interval great price changes may occur. Buyers and sellers struggle for the advantage of position. The seller is desirous of being paid as surely and as soon as possible, realizing that the vendee at a distant point has it in his power to reject on trivial grounds merchandise on arrival, and cause considerable hardship to the shipper. Letters of credit meet this condition by affording celerity and certainty of payment. Their purpose is to insure to a seller payment of a definite amount upon presentation of documents. The bank deals only with documents. It has nothing to do with the quality of the merchandise. Disputes as to the merchandise shipped may arise and be litigated later between vendor and vendee, but they may not impede acceptance of drafts and payment by the issuing bank when the proper documents are presented.

██ The essential element of a letter of credit which is absent here is a direct promise by the bank to pay the addressee of the letter. As stated in Second National Bank of Toledo v. M. Samuel & Sons,

Inc., 12 F.2d 963, 966 (2d Cir.), "A letter of credit is a letter whereby one person requests some other person to advance money or give credit to a third person, and promises to repay the same *to the person making the advancement.*" (Italics added.) See also Border National Bank of Eagle Pass, Tex. v. American National Bank, 282 F. 73 (5th Cir.), error dism. and cert. denied, 260 U.S. 701, 43 S.Ct. 96, 67 L.Ed. 471 (letter of credit is an obligation of issuer to the beneficiary); 50 Am.Jur.2d Letters of Credit § 1 at 398 ("an agreement whereby the writer assumes responsibility for payment to the addressee"); 9 C.J.S. Banks and Banking § 175 at 383–384, § 176a at 384–385. This element also is in the Uniform Commercial Code. Code, 1971, § 554.5103(1) (a) and (d). We conclude that the instant letter was a notification to Johnston of the Bank's loan commitment to Triers but that it was not a letter of credit.

We hold that Johnston's failure to fulfill the underlying agreement to furnish Triers with marketable title, so that they in turn could present marketable title to the Bank, means that Johnston cannot recover from the Bank.

Affirmed.

All Justices concur except HARRIS, J., who takes no part.