NEW YORK LIFE INSURANCE COMPANY *v.* HARTFORD NATIONAL BANK & TRUST COMPANY

HOUSE, C. J., LOISELLE, BOGDANSKI, LONGO and SPEZIALE, Js.

Argued May 4—decision released September 20, 1977

*John B. Nolan,* with whom, on the brief, were *Americo R. Cinquegrana* and *Jon E. Hayden,* for the appellant-appellee (plaintiff).

*Elliott B. Pollack,* with whom was *Howard L. Siegel,* for the appellee-appellant (defendant).

SPEZIALE, J. Both parties have appealed from the judgment rendered in an action brought pursuant to General Statutes § 42a-5-115.[1] The plaintiff sought damages for an alleged wrongful dishonor of a draft in the face amount of $180,000 drawn against

[1] General Statutes § 42a-5-115 provides, in relevant part: "REMEDY FOR IMPROPER DISHONOR OR ANTICIPATORY REPUDIATION. (1) When an issuer wrongfully dishonors a draft or demand for payment presented under a credit the person entitled to honor has with respect to any documents the rights of a person in the position of a seller· as defined in section 42a-2-707 and may recover from the issuer the face amount of the draft or demand together with incidental damages

a letter of credit which had been issued by the defendant in favor of the plaintiff. The plaintiff is appealing the court's award of only nominal damages; the defendant has cross appealed from the summary judgment as to its liability and from the denial of its setoff.

The business transaction giving rise to the present litigation involved the following facts: On May 12, 1972, the defendant, Hartford National Bank & Trust Company, hereinafter Hartford National, issued its irrevocable letter of credit to the plaintiff, New York Life Insurance Company, hereinafter New York Life, as beneficiary. It did so on behalf of its customers James Minges and Richard Gordon, who did business under the trade name Talcott Village Company, hereinafter TVC. TVC was the developer of a real estate project in Farmington known as Talcott Village. The development consisted of several parcels of land which were being improved and financed separately. One of these parcels, known as The Exchange, was to be a combination retail/office complex, financed in a two-step procedure conventionally used in the real estate development industry. For the actual construction of The Exchange, TVC borrowed funds on a short-term basis from a real estate investment trust, Wachovia Realty Investments, hereinafter Wachovia. When construction was completed and the complex occupied, New York Life was to have loaned TVC sufficient funds to retire the indebtedness from Wachovia's short-term construction loan,

---

under section 42a-2-710 on seller's incidental damages and interest but less any amount realized by resale or other use or disposition of the subject matter of the transaction. In the event no resale or other utilization is made the documents, goods or other subject matter involved in the transaction must be turned over to the issuer on payment of judgment. . . ."

in return for which New York Life was to receive a permanent first mortgage on The Exchange. TVC paid New York Life a total of $90,000 in consideration for the issuance of a permanent mortgage loan commitment of $9,000,000 at an interest rate of 8 5/8 percent for a term of twenty-eight years. By subsequent amendment, the interest rate was increased to 9 percent and the commitment's expiration date was extended.

One of the conditions of the mortgage loan commitment was the requirement that $180,000 in cash be deposited with the plaintiff to satisfy a liquidated damages provision of the agreement. New York Life and TVC had agreed that in the event TVC did not take up the loan in question, the damages incurred by New York Life would be difficult to ascertain and such damages should be liquidated in the amount of $180,000. In lieu of the cash deposit in that amount required by the terms of the commitment, New York Life agreed to accept an irrevocable letter of credit issued in its favor by Hartford National at the request of TVC, Hartford National's customer. Under the terms of the letter of credit, Hartford National irrevocably promised to honor drafts drawn by New York Life on the sole condition that such drafts be accompanied by a "signed statement of the New York Life Insurance Company that the liquidated damages deposit is due to them under the provisions of this Letter of Credit."

TVC failed to meet the conditions of the mortgage loan commitment before the commitment's expiration date, and the loan was therefore never made. On July 15, 1974, New York Life, through The

Chase Manhattan Bank, presented Hartford National with its sight draft in the amount of $180,000, accompanied by the statement required by the terms of the letter of credit.[2] Nevertheless, despite this demand, Hartford National dishonored the draft of New York Life on July 23, 1974.

The plaintiff, New York Life, began the present action on July 30, 1974, claiming the face amount of the dishonored draft ($180,000) plus interest from the date of dishonor.[3] See General Statutes § 42a-5-115. The defendant, Hartford National, by its answer, admitted the issuance of the letter of credit but denied that it had wrongfully dishonored New York Life's draft. Hartford National also raised five special defenses and claimed setoff. By these special defenses Hartford National claimed that it had no duty to honor the demand for payment because (1) the document accompanying New York Life's draft was ambiguous and insufficient; (2) the liquidated damages clause of the mortgage loan commitment between New York Life and TVC was illegal; (3) Hartford National, as surety, could assert all defenses available to its customer (TVC) against New York Life, including the illegality of the liquidated damages clause; (4) in demanding payment, New York Life had breached its warranty that it had complied with all the necessary conditions of the letter of credit; and (5) New York Life knew or should have known that it could not enforce the liquidated damages clause because it had suffered no actual damage from TVC's failure to take up the mortgage commitment.

---

[2] The statement confirmed that the liquidated damages deposit was due New York Life under the provisions of the letter of credit.

[3] A claim for incidental damages pursuant to §§ 42a-5-115 and 42a-2-710 was not pursued.

An interlocutory summary judgment was granted New York Life as to the liability of Hartford National for wrongful dishonor of the demand for payment. The court (*McCarthy, J.*) stated that there was no material factual dispute as to liability because (1) the documents submitted by New York Life with its draft were in facial compliance with the terms of the letter of credit, and (2) the special defenses, even if proved, would not excuse Hartford National from its duty to honor the demand for payment. The court then ordered a hearing to determine the amount of damages.

After a hearing as to damages, the court (*Mulvey, J.*) rendered judgment finalizing the interlocutory judgment in favor of New York Life as to liability, but awarding it only nominal damages. The court also denied Hartford National's setoff, and both parties appealed.

I

"Historically, a Letter of Credit is an assurance of payment upon certain terms and conditions, substituting the acceptable credit standing of a bank or other person for the unknown or doubtful standing of a borrower. It differs from the classical surety undertaking in that it is a primary obligation between the issuer and the beneficiary . . . , and for this reason, the recipient of the Letter is isolated from the arrangement between the issuer and the borrower. In construing the terms of a Letter of Credit, the same general principles apply which govern other written contracts. . . . Except insofar as expressly incorporated therein, the bank's contract with its customer for the Letter of Credit is separate and distinct from the contract which exists between the creditor and the customer/borrower."

*Chase Manhattan Bank* v. *Equibank,* 394 F. Sup. 352, 355 (W.D. Pa.) "Originally conceived as a method of reducing the uncertainties—such as doubt as to the buyer's intentions, reliability, or good faith, and difficulties of foreign litigation— that occur when someone sells goods and services to a buyer in a foreign land, the letter of credit has become a basic tool of a fully developed bank business." Verkuil, "Bank Solvency and Guaranty Letters of Credit," 25 Stanford L. Rev. 716.

Article 5 of the Uniform Commercial Code governs letters of credit in this state. General Statutes §§ 42a-5-101–42a-5-117. A letter of credit which is within the scope of the code is defined as an engagement by a bank or other person, made at the request of a customer, that the issuer will honor drafts or other demands for payment upon compliance with the conditions specified in the credit. General Statutes § 42a-5-103 (1) (a); see, generally, 50 Am. Jur. 2d, Letters of Credit, §§ 1–3; 6 Michie, Banks & Banking, c. 12 §§ 28-35; White & Summers, Uniform Commercial Code §§ 18-1–18-3. A letter of credit is not to be confused with a contract of guaranty or suretyship, because "[u]nder a letter of credit . . . the issuer becomes bound *in the first instance* [primarily liable] to pay the beneficiary, and the beneficiary may look immediately to the issuer for payment of drafts presented. Again, the beneficiary is not subject to the various technical and nontechnical defenses that a guarantor or surety may set up." White & Summers, op. cit., p. 608; see *Chase Manhattan Bank* v. *Equibank,* supra. Accordingly, it is important to stress that the letter of credit arrangement is completely independent of the underlying contract between the beneficiary of the letter of credit and the issuing

bank's customer who has procured the letter of credit.[4] Because of this independence, the issuing bank has a duty to honor drafts or demands for payment where there is factual compliance with the terms of the letter of credit without reference to the terms of the underlying contract. See 19 Connecticut General Statutes, Annotated (West Ed.) § 42a-5-114 (1), comment.

"The isolation of the issuer of a credit from the underlying sales contract has made it possible for the letter of credit to remain an economical and practical financing device, since the issuer's receipt, examination, and payment of the documents accompanying a draft can be achieved in a standardized and inexpensive manner." Annot., 35 A.L.R.3d 1404, 1406. Thus, one of the expected advantages and essential purposes of a letter of credit is that the beneficiary will be able to rely on assured, prompt payment from a solvent party; necessarily, a part of this expectation of ready payment is that there will be a minimum of litigation and judicial interference, and this is one of the reasons for the value of the letter of credit device in financial transactions. See, generally, 50 Am. Jur. 2d, Letters of Credit; annot., 35 A.L.R.3d 1404, 1407; Verkuil, op. cit.; White & Summers, op. cit. §§ 18-1–18-8; see also Murray, "Letters of Credit in Nonsale of Goods Transactions," 30 Bus. Law. 1103; Armstrong, "The Letter of Credit as a Lending Device in a Tight Money Market," 22 Bus. Law. 1105.

The underlying transaction in this case, the mortgage loan commitment between New York Life and

---

[4] In the present case, this underlying contract was the mortgage loan commitment between the beneficiary (New York Life) of the letter of credit issued by Hartford National and the customer (TVC) of Hartford National.

TVC, exemplifies the fact that the "convenience, reliability, and inexpensiveness" of the letter of credit has prompted expansion of its use beyond sale of goods arrangements. See Verkuil, op. cit., generally, and p. 721. Although the banker's letter of credit was originally developed in transactions involving the financing of sales of goods, "there is no legal or economic reason for limiting its use to this relatively narrow area." Murray, op. cit., p. 1103. It is apparent both from its wording and spirit that Article 5 was intended to have an expansive scope applicable to a variety of letter of credit transactions besides those involving the sale of goods. See White & Summers, op. cit. § 18-3; annot., 35 A.L.R.3d 1404; Verkuil, op. cit.; Armstrong, op. cit.; Murray, op. cit. In urging a "liberal interpretation to promote underlying purposes and policies," the official comment to § 42a-5-102 emphasizes that "the law of letters of credit is still developing" and that § 42a-5-102 (3) "makes explicit the court's power to apply a particular rule by analogy to cases not within its terms, or to refrain from doing so." 19 Connecticut General Statutes, Annotated (West Ed.) § 42a-5-102, comment.

In the present case, Hartford National issued a letter of credit by which it promised to honor drafts from New York Life on the sole condition that they be accompanied by a signed statement that the liquidated damages deposit was due under the provisions of the letter of credit. Hartford National does not dispute that, upon TVC's failure to take up the loan, New York Life presented its draft demanding payment, together with a signed statement that the deposit was due under the letter of credit. At that point, the issuing bank's (Hartford National) function was simply to examine the

documents presented by the beneficiary (New York Life) to determine whether they were apparently regular and in compliance on their face with the terms of the letter of credit. General Statutes §§ 42a-5-109 (2), 42a-5-114; see *Fidelity Bank* v. *Lutheran Mutual Life Ins. Co.,* 465 F.2d 211, 214 (10th Cir.); *Intraworld Industries, Inc.* v. *Girard Trust Bank,* 461 Pa. 343, 336 A.2d 316, 323; see also 6 Michie, Banks & Banking, c. 12 § 32; White & Summers, Uniform Commercial Code § 18-6.

Generally, if the documents presented conform to the requirements of the credit, the issuer is not required or even permitted to go behind the documents before honoring demands for payment. See, e.g., *Intraworld Industries, Inc.* v. *Girard Trust Bank,* supra, and cases cited. Hartford National did not actually contest the facial compliance of New York Life's statement with the letter of credit. Rather, by its special defenses, it sought to raise basically two claims: (1) that the modification of the mortgage loan commitment between New York Life and TVC rendered ambiguous and insufficient New York Life's statement accompanying its draft, and (2) that the liquidated damages clause was an unenforceable, illegal penalty. Only in rare situations of egregious fraud would § 42a-5-114 have justified the issuer, on the facts presented here, in going behind apparently regular, conforming documents; such fraud "must be narrowly limited to situations . . . in which the wrongdoing of the beneficiary has so vitiated the entire transaction that the legitimate purposes of the independence of the issuer's obligation would no longer be served." *Intraworld Industries, Inc.* v. *Girard Trust Bank,* 461 Pa. 343, 336 A.2d 316, 324–25; see White & Summers, op. cit. § 18-6. There is no such evidence in

the record of this case, and the court correctly found that the documentation presented by New York Life complied fully with the terms of the letter of credit.

Alleged modification of the letter of commitment, and the question of whether this commitment's liquidated damages clause was a penalty, were claims relating to the mortgage loan commitment contract between TVC and New York Life which, as discussed previously, was entirely separate and independent from the letter of credit arrangement involving Hartford National and New York Life. In the present case, these allegations were not proper defenses to the issuer's obligation to honor the draft pursuant to the letter of credit. See, e.g., *Fidelity Bank* v. *Lutheran Mutual Life Ins. Co.*, supra; *Prudential Ins. Co. of America* v. *Marquette National Bank of Minneapolis,* 419 F. Sup. 734, 736, (D. Minn., 4th Div.); *Chase Manhattan Bank* v. *Equibank,* 394 F. Sup. 352, 358 (W.D. Pa.). We hold that the court below did not err in granting summary judgment as to the liability of Hartford National for wrongful dishonor.

## II

There was error, however, in the court's award of only nominal damages to New York Life. Section 42a-5-115 (1) states, in relevant part, that the beneficiary of a wrongfully dishonored letter of credit "may recover from the issuer the face amount of the draft or demand . . . and interest but less any amount realized by resale or other use or disposition of the subject matter of the transaction. In the event no resale or other utilization is made the documents, goods or other subject matter involved in the transaction must be turned over to the issuer

on payment of judgment." After the hearing in damages, the court found that the "subject matter of the transaction," as that term is used in § 42a-5-115 (1), was the $9,000,000 that New York Life had committed in its mortgage loan commitment to TVC; that New York Life, upon default by TVC, had the opportunity to reinvest the $9,000,000, the return on which exceeded the face amount ($180,000) of the letter of credit and draft; and that New York Life was therefore not damaged by Hartford National's wrongful dishonor of the draft.

On the question of damages, the real issue is the damage that the plaintiff sustained not as a result of TVC's default, but only as a result of Hartford National's dishonor of the plaintiff's draft. This is the plaintiff's action against the defendant, Hartford National, not against TVC.

The court erred in its determination that the $9,000,000 was the "subject matter of the transaction" (the letter of credit). See General Statutes § 42a-5-115. It has been said that the "hallmark" of the letter of credit is that at a certain point it becomes "as good as cash." Verkuil, "Bank Solvency and Guaranty Letters of Credit," 25 Stanford L. Rev. 716, 720; Armstrong, "The Letter of Credit as a Lending Device in a Tight Money Market," 22 Bus. Law. 1105, 1109. One of the conditions of the mortgage loan commitment was a liquidated damages cash deposit of $180,000; however, in lieu of this cash deposit, as the court expressly found, New York Life agreed to accept the letter of credit in the same amount. The letter of credit, on its face, specifically stated that it represented the liquidated damages deposit. Clearly, the purpose and intent

of the letter of credit was to provide New York Life with an assured method of obtaining payment of the liquidated damages provided for in the mortgage loan commitment. As the court further found, New York Life permitted TVC to substitute Hartford National's letter of credit for its obligation to provide the liquidated damages deposit in cash. Upon TVC's default and the proper presentation of documents, New York Life had a right to expect the letter of credit to become as good as the cash deposit which would otherwise have been available from TVC. The present litigation has thus far thwarted this expectation. The $9,000,000 was the subject of the underlying transaction (the mortgage loan commitment) which, as the court correctly found, was an entirely independent contract. The performance secured to New York Life by Hartford National's letter of credit was not the performance by TVC of its obligations under the mortgage loan commitment, but solely the payment of damages, liquidated in advance by agreement between TVC and New York Life, which would result from TVC's failure to take up the loan.

Consequently, on the facts of this case and the record before us, it appears that the "resale or other use or disposition" provision of § 42a-5-115 (1) was not properly applicable. That provision has generally been considered in the traditional context of the sale of goods. See White & Summers, Uniform Commercial Code § 18-6. This case, however, involved a pure credit transaction, an area into which the use of letters of credit has recently been expanded. In the traditional sale of goods context, when the issuing bank pays the beneficiary, it "receives documents of title to goods in which it has an immediate security interest of some value."

Verkuil, "Bank Solvency and Guaranty Letters of Credit," 25 Stanford L. Rev. 716, 721. In the pure credit situation, however, the only documents tendered before payment "will likely be statements of default in payment or performance . . . which merely provide written notice that payment is due. Since the bank has no obligation and no right to go behind these documents, it will pay without receiving anything of value." Verkuil, op. cit., p. 723. Obviously, the risks for the issuing bank are quite different in each situation. It is thus most significant that the "subject matter of the transaction" in this case was not tangible goods but rather a financial agreement involving pure credit. In such circumstances, the Code option of "resale or other use or disposition" would not normally appear to be applicable. The subject matter of the present letter of credit is not realistically susceptible to the "resale or other use or disposition" concept. Accordingly, we hold that New York Life was entitled to "recover from the issuer the face amount of the draft [$180,000] . . . together with . . . interest" from the date of dishonor. General Statutes § 42a-5-115 (1).

There is no error in the cross appeal of the defendant; there is error in the appeal of the plaintiff, the judgment as to damages is set aside and the case is remanded with direction that judgment be rendered in accordance with this opinion.

In this opinion the other judges concurred.