**FIRST NATIONAL BANK OF COUNCIL BLUFFS, Appellant,**

v.

**ROSEBUD HOUSING AUTHORITY, Appellee,**

and

**Rosebud Sioux Indian Tribe; C. E. Light; Thomas L. Peddicord and T. Jean Peddicord; and Thunderbolt Enterprises, Inc., Defendants.**

**No. 63908.**

Supreme Court of Iowa.

April 23, 1980.

Rehearing Denied May 16, 1980.

Philip Willson of Smith, Peterson, Beckman & Willson, Council Bluffs, for appellant.

Craig W. Thompson and Virgil J. Haggart, Jr., of Baird, Holm, McEachen, Pedersen, Hamann & Haggart, Omaha, Neb., and Charles L. Smith of Telpner & Smith, Council Bluffs, for appellee.

Considered by REYNOLDSON, C. J., and LeGRAND, UHLENHOPP, ALLBEE and LARSON, JJ.

REYNOLDSON, Chief Justice.

In this case of first impression, we must analyze the obligation of an issuing bank to honor drafts drawn on two letters of credit.

Plaintiff First National Bank of Council Bluffs dishonored a "demand and draft" on letters it issued, then sought a declaratory judgment fixing "the rights, duties and obligations" of all the parties. Defendant Rosebud Housing Authority (Rosebud), beneficiary of the letters issued by the bank at the request of its customer, defendant Thunderbolt Enterprises, Inc. (Thunderbolt), filed answer and counterclaim demanding judgment on the letters in the amounts of $185,058 and $81,966, respectively, together with punitive damages. Defendants C. E. Light, Thomas L. Peddicord and T. Jean Peddicord (guarantors) filed answer admitting they had assigned $267,024 in certificates of deposit to the bank "to be held as collateral security for any and all drafts drawn on either or both of said Letters of Credit . . . ." They prayed that the court declare the letters unenforceable.

Trial court entered partial summary judgment against the bank for $267,024 (the total of the letters of credit) on Rosebud's counterclaim. It then granted summary judgment in favor of the bank on the issues of punitive damages. The bank appeals, and we affirm.

Rosebud, an agency of the Rosebud Sioux Indian Tribe, is located at Rosebud, South Dakota. On May 21, 1976, it contracted with Thunderbolt, a Rapid City, South Da-

kota, contractor, to build two housing projects with financial assistance from the United States Department of Housing and Urban Development. Rather than post performance bonds totaling over $3,000,000, Thunderbolt on June 18, 1976, executed a "Completion Assurance Agreement" for each project which required it to provide an irrevocable letter of credit to be utilized by Rosebud in the event of a default by Thunderbolt.

August 30, 1976, the bank executed an "Irrevocable Straight Letter of Credit" for each project, in favor of Rosebud. These letters totaled $267,024. They provided that in the event Thunderbolt failed to complete construction, Rosebud was authorized to draw the stated amount provided the draft was accompanied by

(1) the completion assurance agreement dated June 18, 1976, with respect to the subject project; and

(2) written certification "that proceeds of any draft drawn against this Letter of Credit will be used solely for the purposes and intents described under the terms of said Completion Assurance Agreement of said Project . . . ."

October 22, 1976, Thunderbolt and Rosebud modified their construction contracts and completion assurance agreements. Completion of construction was reduced from 660 to 365 consecutive days. The measure of liquidated damages for each day of delay was increased from $3 to $21.

Thunderbolt did not complete construction as agreed. On September 15, 1978, Rosebud, under authority granted by the contract, ordered Thunderbolt to stop work on the project. Three days later Rosebud confronted the bank with a "Letter of Demand and Draft" demanding full payment under each letter of credit. This document contained the required certification as to the proceeds, but had attached completion assurance agreements dated October 22, 1976, not June 18, 1976, as required by the bank's letters.

The bank dishonored the draft, asserting as reasons (1) the completion assurance agreements had been changed without the bank's consent in ways which modified the terms of default and increased the bank's risk; (2) the enclosed agreements bore the wrong date; and (3) the certification referred to agreements which bore the wrong date.

September 26, 1978, Rosebud responded with a second demand letter and draft. This draft was accompanied by the completion assurance agreements dated June 18, 1976. It certified that the proceeds from the draft would be used solely in accordance with said agreements.

The bank dishonored this second draft, again relying on the contract modifications agreed to by Rosebud and Thunderbolt, but not the bank. Other grounds were based on the prior draft which did not comport with the letters. In the interim, the guarantors were protesting that the letters, in view of the contract modifications, should not be honored. The bank, caught in this cross fire, turned to the court for a resolution of the controversy. The court held the letters of credit were independent of any underlying agreement and determined the bank was required to pay the second draft which met the conditions set out in the letters.

In this appeal the bank seeks reversal, asserting it rightly dishonored the draft because (1) the draft did not comply strictly with the letters because the first draft disclosed that the completion assurance agreements of June 18, 1976, having been amended, were no longer in effect; (2) the documents were amended without the bank's consent; and (3) had the bank honored the draft against the letter of credit the effect would have been to accept fraudulent documents. We treat these issues in the divisions which follow.

I. Our analysis starts with an overview of the law of letters of credit. Such instruments are treated legislatively in Article 5 of our Uniform Commercial Code, sections 554.5101 through 554.5117. Section 554.-5103(1)(a) defines "letter of credit":

(a) "Credit" or "letter of credit" means an engagement by a bank or other person made at the request of a customer and of a kind within the scope of this Article (section 554.5102) that the issuer will honor drafts or other demands for payment upon compliance with the conditions specified in the credit. A credit may be either revocable or irrevocable. The engagement may be either an agreement to honor or a statement that the bank or other person is authorized to honor.

Letters of credit developed as a part of the law merchant. H. Harfield, *Bank Credits and Acceptances* 30 (5th ed. 1974). Traditionally such letters were used in sale of goods transactions in which the seller demanded that the buyer provide an irrevocable assurance of payment from a bank to the seller, on behalf of the buyer, upon condition that the seller deliver to the bank documents (ordinarily title papers) specified in the letter of credit. *First Empire Bank-New York v. F.D.I.C.*, 572 F.2d 1361, 1366 (9th Cir.), *cert. denied*, 439 U.S. 919, 99 S.Ct. 293, 58 L.Ed.2d 265 (1978); *East Bank of Colorado Springs v. Dovenmuehle, Inc.*, 196 Colo. 422, 425, 589 P.2d 1361, 1363 (1978); Verkuil, *Bank Solvency and Guaranty Letters of Credit*, 25 Stan.L.Rev. 716, 718 (1973).

Such letters have a unique commercial function in international transactions where the buyers and sellers are unacquainted and rapid, guaranteed payments are essential. *Asociacion De Azucareros De Guatemala v. United States National Bank of Oregon*, 423 F.2d 638, 641 (9th Cir. 1970).

■ Typically, in the sale of goods transaction the letter of credit is one of three distinct contracts. The letter is a contract between the bank and a "beneficiary"—ordinarily the seller. A second contract exists between the buyer ("customer") and the bank relating to the issuance of the letter. The third is the sales contract between the seller ("beneficiary") and the buyer. Verkuil, *supra*, at 719. "These three agreements, while functionally related and comprising elements of an overall transaction, are entirely separate and distinct from one another as a matter of law." H. Harfield, *supra*, at 32.

The key to the commercial vitality and function of a letter of credit is that the issuing bank's promise is independent of the underlying contracts, and the bank should not resort to them in interpreting a letter of credit. *Pringle-Associated Mortgage Corp. v. Southern National Bank of Hattiesburg, Mississippi*, 571 F.2d 871, 874 (5th Cir. 1978). The respective parties are protected by careful description of the documents which will trigger payment. The growth of the letter of credit as a viable commercial tool has been stimulated by the ease of enlisting participation by the issuing bank, which may meet its obligation simply by paying on the basis of stipulated documents, thus avoiding factual disputes relating to the underlying transactions. *Dovenmuehle*, 196 Colo. at 425, 589 P.2d at 1363; *see Johnston v. State Bank*, 195 N.W.2d 126, 130 (Iowa 1972); Annot., 35 A.L.R.3d 1404, 1406 (1971).

More recently, the letter of credit device has expanded beyond the sale of goods transaction to effect results previously obtained by other instruments, including performance bonds, escrow agreements, repurchase agreements, steamship guaranties and leases on real and personal property. *See First Empire Bank-New York*, 572 F.2d at 1367; *Dovenmuehle*, 196 Colo. at 425, 589 P.2d at 1363; Verkuil, *supra*, at 721.

Against this legal history and backdrop, we turn to an examination of the issues before us. Upon examination it is clear Rosebud's second draft strictly complied with the conditions set forth in the letters. The problem arises because the underlying agreement was modified so that the documents submitted no longer reflected the contract between the "customer" (Thunderbolt) and the "beneficiary" (Rosebud). The bank, of course, had actual notice of this fact when the amendatory instruments were submitted with the first draft.

By an innovative twist of applicable law the bank suggests the requirement that there be strict compliance with the terms of the letters of credit negates its obligation to

pay, because the June 18, 1976, contracts referred to in the letters and submitted with the second draft were no longer effective.

■ It is true that the law requires the bank to "examine documents with care so as to ascertain that on their face they appear to comply with the terms of the credit . . . ." § 554.5109(2); *see Chase Manhattan Bank v. Equibank*, 550 F.2d 882, 886 (3d Cir. 1977) ("Both parties are held to a standard of strict compliance—in the absence of conformity, the beneficiary cannot force payment and the bank pays at its peril."); *AMF Head Sports Wear, Inc. v. Ray Scott's All-American Sports Club, Inc.*, 448 F.Supp. 222, 223 (D.Ariz.1978). The reason, as we have already indicated, is obvious:

> If courts deviate from the rule of strict compliance and insist in certain undefined situations that banks make payments notwithstanding the fact that the beneficiary failed to comply with the terms stipulated in the letter of credit, the certainty that makes this device so attractive and useful may well be undermined, with the result that banks may become reluctant to assume the additional risks of litigation.

*Insurance Company of North America v. Heritage Bank*, 595 F.2d 171, 176 (3d Cir. 1979).

But the strict compliance doctrine is misapplied by the bank: The doctrine refers to the face of the documents, judged by the terms of credit, not to their efficacy or continued viability. This principle is codified in section 554.5114(1):

> An issuer must honor a draft or demand for payment which complies with the terms of the relevant credit *regardless of whether the* goods or *documents conform to the underlying contract* for sale or other contract *between the customer and the beneficiary.*

(Emphasis provided.)

The bank's brief provides no authority which holds that an issuing bank has a right, let alone a duty, to look to the underlying agreement between its customer and the beneficiary. On the contrary, the principle that the letter of credit is an independent promise as stated in section 554.5114(1) has been uniformly applied and enforced. *See, e. g., First Empire Bank-New York*, 572 F.2d at 1366; *Courtaulds North America, Inc. v. North Carolina National Bank*, 528 F.2d 802, 805 (4th Cir. 1975); *Barclays Bank D.C.O. v. Mercantile National Bank*, 481 F.2d 1224, 1238–39 (5th Cir. 1973), *cert. dismissed*, 414 U.S. 1139, 94 S.Ct. 888, 39 L.Ed.2d 96 (1974); *Lumbermans Acceptance Co. v. Security Pacific National Bank*, 86 Cal.App.3d 175, 178, 150 Cal.Rptr. 69, 71 (1978); *New York Life Insurance Co.v. Hartford National Bank & Trust Co.*, 173 Conn. 492, 498–99, 378 A.2d 562, 567 (1977); *Mid-States Mortgage Corp. v. National Bank of Southfield*, 77 Mich.App. 651, 655, 259 N.W.2d 175, 177 (1977); *Shaffer v. Brooklyn Park Garden Apartments*, 311 Minn. 452, 461–62, 250 N.W.2d 172, 178–79 (1977); *Werner v. A. L. Grootemaat & Sons, Inc.*, 80 Wis.2d 513, 522, 259 N.W.2d 310, 314 (1977). Most courts "fear that the sacred cow of equity may trample the tender vines of letter-of-credit law" and therefore insist that there be no retreat to documents which will do just as well, or which are substantially similar. *Heritage Bank*, 595 F.2d at 175, *quoting from* Harfield, *Code, Customs and Conscience in Letter-of-Credit Law*, 4 U.C.C.L.J. 7, 11 (1972). *See Johnston*, 195 N.W.2d at 130; H. Harfield, *supra*, at 73.

■ We hold that where, as here, all other conditions were met and the exact documents required by the letters of credit were attached to the draft, the bank's obligation to pay was triggered, irrespective of its knowledge that Rosebud and Thunderbolt had amended those documents by separate instruments.

■ II. What we have written in division I virtually disposes of the bank's second contention, that its dishonor of the draft was proper because the documents were amended without its consent. This

argument might be valid if the bank were a surety or guarantor.

■ However, the bank's role was not that of a surety or guarantor of the underlying contract, because the letter of credit entails a primary liability of the issuer to the beneficiary, rather than a secondary liability following a default. *Barclays Bank D.C.O.*, 481 F.2d at 1235; *Asociacion De Azucareros De Guatemala*, 423 F.2d at 641; *New York Life Insurance Co.*, 173 Conn. at 497–98, 378 A.2d at 566; Joseph, *Letters of Credit: The Developing Concepts and Financing Functions*, 94 Banking L.J. 816, 851 (1977). As to the questionable power of a national bank to act as surety or guarantor, see *First Empire Bank-New York*, 572 F.2d at 1367; *Thilmany v. Iowa Paper-Bag Co.*, 108 Iowa 333, 336, 79 N.W. 68, 68 (1899); 12 U.S.C. § 24 (1940). Thus the bank had no legal interest in modifications of the underlying contracts, nor any direct interest relating to a default in performance of those contracts. *See Johnston*, 195 N.W.2d at 130. It had no liability or responsibility "for the performance of the underlying contract . . . between the customer and beneficiary . . . ." § 554.5109(1)(a), The Code.

We find this proposition relied on for reversal to be without merit.

■ III. Finally, the bank asserts it rightly dishonored the draft because had it honored the draft "the effect would have been to accept fraudulent documents." It reasons that because it knew the June 18, 1976, documents had been amended there was fraud "apparent on the face of the documents" and it might have no recovery against Thunderbolt if it paid the draft. The bank refers to the following subsection of section 554.5114(2):

> (b) in all other cases as against its customer, an issuer acting in good faith may honor the draft or demand for payment despite notification from the customer of fraud, forgery or other defect not apparent on the face of the documents but a court of appropriate jurisdiction may enjoin such honor.

It cannot be deemed to have acted "in good faith," the bank asserts, when the various documents presented gave it actual knowledge the June 18, 1976, contracts had been amended.

However, the June 18, 1976, contracts had not been physically changed, nor is there any allegation in the district court or here that those contracts were fraudulent in any particular. That they no longer represented the agreement of the parties in every respect is immaterial. *Chase Manhattan Bank*, 550 F.2d at 885 ("The issuing bank deals only in documents and need only determine whether they appear on their face to be in accordance with the terms and conditions of the credits."); *Asociacion De Azucareros De Guatemala*, 423 F.2d at 641 ("[A]ny modification or revocation of the underlying agreement between buyer and seller . . . cannot be permitted to affect the letter of credit unless the beneficiary explicitly consents to the alteration or revocation of the letter."); § 554.5114(1), The Code.

■ The facts here do not present a case of "fraud" as that word in UCC Article 5 has been interpreted. *West Virginia Housing Development Fund v. Sroka*, 415 F.Supp. 1107, 1114 (W.D.Pa.1976); *Mid-States Mortgage Corp.*, 77 Mich.App. at 654–55, 259 N.W.2d at 177–78; *Werner*, 80 Wis.2d at 522–23, 259 N.W.2d at 315. Nor does this matter arrive here in the form of an action to enjoin payment of the draft, brought by Thunderbolt. *See Shaffer*, 311 Minn. at 464–68, 250 N.W.2d at 180–82. Upon becoming aware the first documentation furnished was improper, Rosebud had a right to remedy the defect before the expiration of the credit. *See Barclays Bank D.C.O.*, 481 F.2d at 1236.

We are not persuaded these circumstances present a case of fraud which would permit the bank to withhold payment.

IV. Because the judgments entered in this case did not declare the rights of the bank against the guarantors, nor the guarantors against Thunderbolt, we questioned

the finality of the judgment when this appeal was orally submitted. Our further study of the record has convinced us these parties did not intend to submit those issues, nor were they submitted to the court for disposition. In any event, those issues, if they were in the case, were "separable by some distinct line of demarcation" from the issues which were the subjects of the summary judgment motions. *See Wilson v. Nepstad*, 282 N.W.2d 664, 666 (Iowa 1979). *See also Lyon v. Willie*, 288 N.W.2d 884, 886–87 (Iowa 1980). It is clear the bank appealed from a final judgment as to it.

AFFIRMED.