SARAH W.P. BROWN ET AL., APPELLANTS AND CROSS-APPELLEES,
v. UNITED STATES NATIONAL BANK OF OMAHA, APPELLEE AND
CROSS-APPELLANT, GUARANTY BANK & TRUST COMPANY,
INTERVENOR-APPELLEE AND CROSS-APPELLANT.
371 N.W.2d 692

Filed August 9, 1985.    No. 84-488.

Christine M. Schild of Schumacher & Gilroy, for appellants.

Michael M. Hupp and David J. Lanphier of McGill, Koley, Parsonage & Lanphier, P.C., for appellee.

Thomas J. Culhane of Erickson & Sederstrom, P.C., and George W. Dahnke of Hastie and Kirschner, for intervenor-appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

SHANAHAN, J.

Sarah W.P. Brown; Sarah W.P. Brown, custodian for Charles D. Brown III; Sarah W.P. Brown, custodian for James A. Brown; and the Brown Family Partnership, a Nebraska partnership (herein collectively called "Brown"), appeal the judgment of the district court for Douglas County denying an injunction preventing payment to Guaranty Bank & Trust Company (Guaranty) regarding letters of credit issued by United States National Bank of Omaha (U.S.N.B.). We affirm in part, reverse in part, and remand with directions.

Invoil LA-TX Drilling Fund 1981, Ltd. (Invoil), was a limited partnership to be formed in Oklahoma for drilling development oil and gas wells. A development well is drilled in a known producing formation in a previously discovered field or extends limits of a known oil and gas reservoir. Invoil Inc., an Oklahoma corporation, was the general partner of Invoil, the proposed limited partnership.

To finance operations, Invoil negotiated a "Loan Agreement" with Guaranty of Oklahoma City. As collateral for its loan to Invoil, Guaranty agreed to accept certain letters of credit from Invoil's limited partners. The Invoil-Guaranty loan agreement contained the following provisions:

Draw on Letter of Credit. . . . If any other event of Default occurs, [Guaranty] will have the right to draw down the entire outstanding balance of each of the Letters of Credit. The amount received from such draw down will be credited by [Guaranty] to the Note together with interest thereon and costs of collection thereof, including a reasonable attorney's fee, with any excess, after the payment thereof, to be paid by [Guaranty] to the respective Limited Partner or refunded to the Issuing Bank for the respective Limited Partner's account. . . .

. . . .

Disclaimer. . . . (a) [Guaranty] has made no evaluation of [Invoil] and will not be deemed to have made any representation as to the proposed activities of [Invoil] or the financial strength or integrity of [Invoil Inc.]; (b) [Guaranty] has no responsibility or liability for the issuance, offer or sale of the interests in [Invoil]; and (c)

nothing herein contained or contained in any Loan Document or the Private Placement Memorandum is intended by the parties hereto to impose such liability or responsibility on [Guaranty]. [Guaranty] has made no representation, warranty or statement regarding the advisability of the Limited Partners' purchasing the Limited Partnership interest. [Guaranty] did not participate in the preparation of the Private Placement Memorandum and is not responsible for any statements contained therein or the accuracy or completeness thereof. [Guaranty] will not in any way be responsible or liable to [Invoil], [Invoil Inc.] or any other party for determination of the amount, type, source or what constitutes revenue or income from [Invoil]. [Guaranty] may rely on the representations made by [Invoil Inc.] in the Private Placement Memorandum for [Invoil] as if such representations were made directly to [Guaranty] by [Invoil Inc.]. This Disclaimer and this paragraph must be set forth in the Private Placement Memorandum.

Invoil issued a "Private Placement Memorandum" summarizing the "program," that is, subscription in the limited partnership, and stating:

THESE SECURITIES INVOLVE A HIGH
DEGREE OF RISK

. . . .

THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES ACT AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION UNDER THE ACT OR AN OPINION OF COUNSEL ACCEPTABLE TO THE GENERAL PARTNER, THAT SUCH REGISTRA-TION IS NOT REQUIRED. ADDITIONAL RESTRICTIONS ON TRANSFER ARE CONTAINED HEREIN.

The private placement memorandum separately contained Guaranty's disclaimer required by the loan agreement and a copy of the loan agreement itself. The placement memorandum

described a "Subscription Payment Option" available to investors:

> Persons subscribing in cash shall pay their full cash subscription of $75,000 per Unit at the time of executing a Subscription Agreement. However, persons subscribing under the Subscription Payment option shall pay their subscription in the following manner: $15,000 of each Unit shall be paid in cash, the remaining $60,000 shall be payable on a deferred basis, coupled with the assumption of, and personal liability for, their pro rata share of a Program loan. Such obligation for payment will further be secured by the delivery of an irrevocable letter of credit (in a face amount of $69,000) from the Subscription Payment Participant's bank, in a form and drawn on a bank, satisfactory to the General Partner.

The limited partnership agreement for Invoil in part provided:

## CAPITAL CONTRIBUTIONS

4.1. The Limited Partners and the Special Limited Partner.

> (a) The General Partner intends to permit a maximum of thirty-four (34) Limited Partners and the Special Limited Partner . . . to invest in the Partnership at a minimum Initial Subscription of one (1) Unit unless the General Partner, at its sole discretion, agrees to accept a lesser amount. The price per Unit is $75,000, whether a Limited Partner contributes to the capital of the Partnership in cash or elects the Subscription Payment method. . . .
>
> . . . .
>
> (c) A Limited Partner may pay his Initial Subscription by electing to use the Subscription Payment.
>
> (d) A prospective Limited Partner may subscribe to a Limited Partner's Interest by completing and executing the signature page to the Partnership Agreement appended hereto and by tendering the executed signature page along with his payment in cash or letter of credit required by the Subscription Payment.

In the Invoil partnership agreement, immediately above the line supplied for a limited partner's signature, there is printed:

"I hereby assume my proportionate share of any Partnership 'Letter of Credit' loan to the extent of my letter of credit given in accordance with Section 4.1 of the Limited Partnership Agreement."

A Prudential-Bache representative gave Invoil's private placement memorandum to James Schumacher, Brown's attorney. After Schumacher's examination of the private placement memorandum, Brown signed the Invoil limited partnership agreement and purchased two units of Invoil under the "Subscription Payment Option." Pursuant to such option, Brown paid $30,000 in cash and directed U.S.N.B. to issue two irrevocable letters of credit, Nos. 02414 and 02415. Each letter of credit had a face amount of $70,000, expired on July 31, 1983, and authorized Guaranty to sight draw $70,000 when an officer of Guaranty signed a statement "certifying that the amount drawn is due [Guaranty] in connection with the loan to [Invoil]." Interests in Invoil were not registered.

Invoil and Guaranty signed the loan agreement on August 4, 1981. Invoil borrowed $1,860,000 from Guaranty, which, according to Invoil's promissory note, was payable on July 1, 1983. As the result of an inquiry by the Federal Deposit Insurance Corporation, Invoil's general partner, on March 30, 1983, wrote to the FDIC and indicated that unless Guaranty restructured its loan to Invoil bankruptcy was "the only alternative." Guaranty deemed itself "insecure" and, as provided in its loan agreement with Invoil, declared a default regarding the Invoil loan.

On April 13, 1983, Guaranty sent U.S.N.B. two letters stating that Brown's letters of credit were due and enclosed a sight draft in the amount of $70,000 with each letter. In its letter to U.S.N.B. regarding letter of credit No. 02414, Guaranty stated: "We certify the amount drawn is due Guaranty . . . in connection with the loan to Invoil . . . ." Regarding letter of credit No. 02415, Guaranty's letter in part read: "The amount drawn is due Guaranty . . . in connection with the loan [to] Invoil . . . ." Each of Guaranty's letters to U.S.N.B. was signed by the senior executive vice president of Guaranty. Among other documents sent to U.S.N.B. by Guaranty was an "Assumption of Personal Liability" signed by Brown, limiting

Brown's share of Invoil's indebtedness to $60,000.

On April 21 Brown filed an action in the district court for Douglas County seeking to enjoin U.S.N.B. from honoring the letters of credit, and obtained a temporary restraining order enjoining U.S.N.B. from honoring Guaranty's draw authorized by the letters of credit.

In an amended petition Brown alleged that the letters of credit constituted "contracts which arise out of a violation of the Nebraska Securities Act" and are unenforceable by virtue of Neb. Rev. Stat. § 8-1118(4) (Reissue 1983). Brown also alleged misrepresentations in the private placement memorandum of Invoil and a deliberate nondisclosure that Guaranty might call the "full face value of the letter of credits even though the loan secured thereby is substantially less than the face value of the letter of credits to in essence use one investor's credit to pay off another investor's loan or the cost of collecting another investor's loan." Such fraud, Brown alleged, was perpetrated with the "actual knowledge and consent" of Guaranty. In a supplemental petition Brown alleged Guaranty's documentation accompanying its sight draft No. 02415 did not include "certification" of the amount due Guaranty on the Invoil loan. Having filed companion actions in federal courts for rescission of the sale involving Invoil's unregistered securities, Brown requested an injunction prohibiting U.S.N.B. from paying Guaranty's sight draft or that U.S.N.B. "be allowed to honor said letters of credit only to the extent of [Brown's] respective $60,000 participation interest" in Invoil.

U.S.N.B. filed an answer in the form of a general denial. Guaranty filed a petition of intervention requesting dismissal of Brown's petition. Neither bank filed a cross-action to determine liability on account of the letters of credit.

On June 10, 1983, the district court granted a temporary injunction prohibiting U.S.N.B. from honoring Guaranty's sight drafts, provided that Brown obtain an extension of the letters of credit until November 29, 1984, or post a surety bond for $155,000. Brown later filed a surety bond in the amount specified.

At the hearing on the permanent injunction, Brown's attorney, Schumacher, testified about apparent misrepresen-

tations made by Invoil in its private placement memorandum. Schumacher admitted he had read Guaranty's disclaimer as a part of Invoil's placement memorandum. Brown did not dispute Guaranty's good faith in declaring Invoil to be in default on account of prospective bankruptcy proceedings indicated by Invoil.

Sam Hillhouse, senior executive vice president of Guaranty, testified each of Brown's letters of credit was for $70,000, that is, "[w]e used the Letter of Credit as collateral on our loan, and this be at risk and to receive the tax benefits they [Brown] signed a Personal Assumption Agreement which was in the amount of $60,000." Hillhouse explained the $10,000 differential between the letter of credit and personal loan assumption was to "cover expenses we might have in collections and also interest." Hillhouse also testified that all letters of credit as collateral for the Invoil loan had been collected except Brown's two letters of credit. When Guaranty called the letters of credit, the principal of the loan was $1,443,315.33, but, as a result of calling the letters of credit, Guaranty had received $1,894,970. Guaranty's collection in excess of the face amount of the loan was returned to Invoil's investors pursuant to the loan agreement. Hillhouse admitted he had not read the Invoil memorandum, although it was his usual practice to read a private placement memorandum in ventures similar to Invoil's program.

The district court dissolved the temporary injunction and, among its findings, factually determined Guaranty's "call of the letters" in their face amount of $70,000 was not "fraud in the underlying transaction" justifying an injunction; Guaranty was entitled to make its call "in the amount of the face value" of each letter of credit; and Guaranty's documentation complied with the letters of credit.

The district court then ordered U.S.N.B. to honor Guaranty's draw on each of Brown's letters of credit, but limited such draw to $55,000, which the district court decided was Brown's pro rata share of Guaranty's "Letter of Credit" loan to Invoil.

Brown has appealed and argues the district court should have enjoined U.S.N.B. from honoring Guaranty's draw upon the letters of credit. Brown contends an injunction should have

been granted because interests in the Invoil limited partnership were unregistered, nonexempt securities in violation of securities laws, state and federal; there was fraud in the transaction underlying the letters of credit; Guaranty's draw of $70,000, exceeding Brown's acknowledged $60,000 liability as a pro rata share of Invoil's debt, is fraudulent; and Guaranty had not complied with documentation requirements contained in the letters of credit, namely, Guaranty had not certified that the amount drawn was due Guaranty under the loan to Invoil.

Guaranty has cross-appealed and claims the district court should have directed U.S.N.B. to honor its draw for $70,000, the face amount of each letter of credit.

In its cross-appeal U.S.N.B. contends the letters of credit expired at the latest on November 29, 1983, so that U.S.N.B.'s obligation has been terminated by such expiration.

Historically, a letter of credit was a commercial device for assuring payment of the purchase price to a seller under a contract for the sale of goods by substituting a bank's acceptable credit standing for the unknown standing of a buyer. See, *New York Life Ins. Co. v. Hartford National Bank & Trust Co.*, 173 Conn. 492, 378 A.2d 562 (1977); J. White & R. Summers, Handbook of the Law Under the Uniform Commercial Code § 18-1 (2d ed. 1980). The bank issuing a letter of credit made itself primarily liable to the seller of goods and paid the seller on presentation of a draft accompanied by various types of shipping documents. See *O'Grady v. Bank*, 296 N.C. 212, 250 S.E.2d 587 (1978).

More recently, as a species of letters of credit there has appeared the standby letter of credit, which White and Summers characterize as follows:

> [T]he [standby letter of credit] device functions not as a medium of *payment* for property sold, services rendered, or the like, but rather as a "back up" against customer default on financial or other obligations. Such letters function somewhat like guaranties, for it is customer *default* that triggers issuer's obligation.

J. White & R. Summers, *supra* at 709. See 12 C.F.R. § 208.8(d)(1) (1985). See, also, Arnold and Bransilver, *The Standby Letter of Credit—The Controversy Continues*, 10

U.C.C. L.J. 272 (1978).

The standby letter of credit is analogous to a performance bond; for example, a beneficiary will receive payment in the event of default by an obligor on an obligation owed a beneficiary of a letter of credit. However, unlike a surety or other forms of guarantee, the issuer of a standby letter of credit is bound in the first instance (primary liability), not secondarily or derivatively. Recovery under a standby letter of credit requires only presentation of documentation specified by the letter of credit, whether or not there has been performance of the basic agreement for which the standby letter of credit has been obtained. See, J. White & R. Summers, *supra* § 18-2; Arnold and Bransilver, *supra*; J. Dolan, The Law of Letters of Credit ¶ 1.05 (1984). Brown's letters of credit are, therefore, standby letters of credit.

Today, letters of credit are primarily governed by the Uniform Commercial Code. See Neb. U.C.C. §§ 5-101 to 5-117 (Reissue 1980). As described in the Uniform Commercial Code, a letter of credit is an engagement by a bank at its customer's request that the bank honor drafts for payment to a beneficiary upon compliance with conditions specified in the letter of credit. See § 5-103, Uniform Commercial Code—Letters of Credit. Article 5 of the U.C.C. makes no distinction between the types of letters of credit. *O'Grady v. Bank, supra.*

The Uniform Commercial Code statutorily obligates the issuer of a letter of credit to honor drafts drawn by the beneficiary in compliance with terms of the credit. As expressed in J. White & R. Summers, *supra* at 711-12:

> This obligation of the issuer to pay the beneficiary is generally *independent* of any obligation . . . of the issuer's customer to the beneficiary under the contract between the customer and beneficiary. It follows that it is generally wrongful for the issuer to dishonor on the ground that the beneficiary has failed to perform its underlying obligations to the issuer's customer. In other words, the issuer generally cannot justify refusal to honor on the ground that its customer is not getting what he bargained for from the beneficiary-seller.

See, *Bank of Newport v. First Nat. Bank*, 687 F.2d 1257 (8th Cir. 1982); *KMW Intern. v. Chase Manhattan Bank, N. A.*, 606 F.2d 10 (2d Cir. 1979); *Chase Manhattan Bank v. Equibank*, 550 F.2d 882 (3d Cir. 1977); *Courtaulds North America, Inc. v. N. C. Nat. Bank*, 528 F.2d 802 (4th Cir. 1975); *Venizelos, S.A. v. Chase Manhattan Bank*, 425 F.2d 461 (2d Cir. 1970); *Dynamics Corp. of Amer. v. Citizens & Southern Nat. Bank*, 356 F. Supp. 991 (N.D. Ga. 1973); *Werner v. A. L. Grootemaat & Sons, Inc.*, 80 Wis. 2d 513, 259 N.W.2d 310 (1977).

A cardinal principle regarding letters of credit is that the credit engagement is completely independent of the underlying contract which engenders a letter of credit. Independence or separation of a letter of credit from the underlying transaction is based on two policy considerations. First, the issuer-bank can assume no liability for performance of the underlying contract because such bank does not control making the underlying contract or selecting the beneficiary of a letter of credit. Second, a letter of credit would lose its commercial vitality and efficacy if, before honoring drafts, the issuer-bank were obliged to look beyond the terms of the letter of credit to the underlying contract and controversy between the bank's customer and the beneficiary of a letter of credit. *Bank of Newport v. First Nat. Bank, supra*; *Intraworld Industries, Inc. v. Girard Trust Bank*, 461 Pa. 343, 336 A.2d 316 (1975).

However, the issuer-bank of a letter of credit does not have an absolute duty to honor a sight draft authorized by a letter of credit. Section 5-114(2) of the U.C.C. provides:

(2) Unless otherwise agreed when documents appear on their face to comply with the terms of a credit but a required document does not in fact conform to the warranties made on negotiation or transfer of a document of title (Section 7-507) or of a security (Section 8-306) or is forged or fraudulent or there is fraud in the transaction

(a) the issuer must honor the draft or demand for payment if honor is demanded by a negotiating bank or other holder of the draft or demand which has taken the draft or demand under the credit and under circumstances which would make it a holder in due course (Section 3-302) and in an appropriate case would make it a person to

whom a document of title has been duly negotiated (Section 7-502) or a bona fide purchaser of a security (Section 8-302); and

. (b) in all other cases as against its customer, an issuer acting in good faith may honor the draft or demand for payment despite notification from the customer of fraud, forgery or other defect not apparent on the face of the documents but a court of appropriate jurisdiction may enjoin such honor.

Section 5-114(2) contemplates a situation in which an issuer-bank may refuse to honor a sight draft or a bank's customer may obtain an injunction if

(1) the documents do not in fact conform to the warranties made on negotiation or transfer of a document of title . . . or of a security . . . or (2) the documents are in fact forged or fraudulent, or (3) there is in fact "fraud in the transaction," provided that the party presenting the draft or demand for payment is the beneficiary or some other party who is not (a) a holder in due course . . . or (b) a person to whom a document of title has been duly negotiated . . . or (c) a bona fide purchaser of a security . . . .

J. White & R. Summers, Handbook of the Law Under the Uniform Commercial Code § 18-6 at 734 (2d ed. 1980).

The Uniform Commercial Code does not statutorily specify the precise nature or elements of "fraud" as such term is used in § 5-114(2). Therefore, the material elements of common-law fraud must be established before any relief is available for the "fraud" contemplated by § 5-114(2). See *West Virginia Housing Development Fund v. Sroka,* 415 F. Supp. 1107 (W.D. Pa. 1976); cf. *Gitschel v. Sauer,* 212 Neb. 454, 323 N.W.2d 93 (1982) (elements of a cause of action for fraudulent representation).

Proceedings for an injunction are within equity jurisdiction. Consequently, we review the matter de novo without reference to the findings of fact made by the trial court. See *Grint v. Hart,* 216 Neb. 406, 343 N.W.2d 921 (1984). A party seeking an injunction must establish by competent evidence every controverted fact to warrant relief. *Grint v. Hart, supra.*

Brown was not entitled to injunctive relief on the ground of fraud.

First, whatever might be misconduct on the part of Invoil, whether fraudulent representation contained in the private placement memorandum or noncompliance with securities law, in the absence of Guaranty's involvement in such alleged misconduct, the credit engagement is completely independent of any conduct in formation of the limited partnership. Cf. *Prudential Ins. Co. of America v. Marquette Nat. Bank*, 419 F. Supp. 734 (D. Minn. 1976) (underlying contract involved payment of a penalty prohibited by law; held, alleged illegality of a commitment standby fee was not a defense). Cf., also, *New York Life Ins. Co. v. Hartford National Bank & Trust Co.*, 173 Conn. 492, 378 A.2d 562 (1977) (although a clause in a loan commitment referred to liquidated damages whereas the payment was actually a penalty prohibited by law, such illegality was not a proper defense to the issuer's obligation to honor a draft pursuant to a letter of credit).

Brown has failed to establish Guaranty's involvement in any alleged misconduct, such as by participation or ratification. Therefore, under the circumstances any improper conduct on the part of Invoil is irrelevant to the case before us.

Second, there was no "fraud in the transaction." In *Sztejn v. Schroder Banking Corp.*, 177 Misc. 719, 31 N.Y.S.2d 631 (1941), a frequently cited case decided before the Uniform Commercial Code, a buyer sought to enjoin payment of drafts under a letter of credit. The seller's documentation complied with the letter of credit, but the goods sold were worthless. The New York court held that although a letter of credit is independent of the underlying contract of sale and a bank is not required to look beyond documentations supplied for payment of a draft authorized by a letter of credit, "the application of this doctrine presupposes that the documents accompanying the draft are genuine," *id.* at 721, 31 N.Y.S.2d at 634, and "the principle of the independence of the bank's obligation under the letter of credit should not be extended to protect the unscrupulous [beneficiary]," *id.* at 722, 31 N.Y.S.2d at 634. Section 5-114(2) of the Uniform Commercial Code has evolved from *Sztejn*. See, also, *United Bank v Sporting Goods*, 41

N.Y.2d 254, 360 N.E.2d 943, 392 N.Y.S.2d 265 (1976). The "fraudulent document" exception relates to a document "that is completely forged or drawn up without any underlying basis in fact, one that is but partly spurious or a document which has been materially altered." *O'Grady v. Bank*, 296 N.C. 212, 234, 250 S.E.2d 587, 601 (1978). As J. White & R. Summers, *supra* at 736, notes, the demarcation between the "fraudulent document" exception and the "fraud in the transaction" exception is not clear, and "[a]t least in some cases, the line is not at all clear, for a 'fraudulent transaction' may be held to generate what would also qualify as 'fraudulent documents'."

In the case before us, Invoil, not Guaranty, sold interests in the limited partnership. Guaranty clearly disclaimed any knowledge of the placement memorandum's contents. Brown did not show that Guaranty participated in preparing or disseminating Invoil's private placement memorandum. Under the circumstances Hillhouse's failure or neglect to read the private placement memorandum does not constitute fraud on Brown. In short, Brown has failed to demonstrate any fraud by Guaranty in the transaction, vitiating the entire transaction so that the legitimate purposes of separation and independence of the issuer's obligation would no longer be served. See *Intraworld Industries, Inc. v. Girard Trust Bank*, 461 Pa. 343, 336 A.2d 316 (1975). There was no "fraud in the transaction."

Third, there was no fraud in Guaranty's draw under the letters of credit. Brown claims there was fraud in Guaranty's draw of $70,000 because Brown's liability for a pro rata share of Invoil's indebtedness was known to be less than the $70,000 face amount of the letter of credit and corresponding sight draft. The "Draw on Letter of Credit," contained in the Invoil-Guaranty loan agreement known to Brown, provided that any excess after collection on the limited partner's letters of credit would be refunded to the bank issuing a letter of credit or to the limited partners. There could be no misrepresentation of a material fact already known to Brown. Cf. *Christopher v. Evans*, 219 Neb. 51, 361 N.W.2d 193 (1985).

Brown's final claim relates to lack of certification concerning documentation presented for letter of credit No. 02415, namely, Guaranty failed to use the word *certify* in its letter to U.S.N.B.,

but, rather, stated that the "amount drawn is due" on Guaranty's loan to Invoil.

An issuer of a letter of credit can refuse to honor such instrument if the beneficiary does not strictly comply with the provisions of the letter of credit for drawing upon such letter. § 5-114(1); *Venizelos, S.A. v. Chase Manhattan Bank*, 425 F.2d 461 (2d Cir. 1970); *Data General Corp. v. Citizens Nat. Bank*, 502 F. Supp. 776 (D. Conn. 1980); *American Bell Intern. v. Islamic Republic of Iran*, 474 F. Supp. 420 (S.D.N.Y. 1979); *United Technologies Corp. v. Citibank, N.A.*, 469 F. Supp. 473 (S.D.N.Y. 1979); *Dynamics Corp. of Amer. v. Citizens & Southern Nat. Bank,* 356 F. Supp. 991 (N.D. Ga. 1973). White and Summers also suggest there is no reason why a bank's customer is not entitled to an injunction preventing an issuer from honoring a draft on a letter of credit in the absence of strict compliance with the documentation requirement.

A particular form or terminology to be used for Guaranty's certification is not prescribed by the Uniform Commercial Code and was not specified by Brown or U.S.N.B. in the letter of credit issued. Certify means "[t]o authenticate or vouch for a thing in writing. To attest as being true or as represented," Black's Law Dictionary 207 (5th ed. 1979); "to make known or establish (a fact)," Webster's New Universal Unabridged Dictionary 297 (2d ed. 1983); "to confirm formally as true, accurate or genuine; to testify or vouch for in writing; to assure or make certain; to tell positively," The American Heritage Dictionary of the English Language 220 (1981). Brown has overlooked the purpose of certification regarding a letter of credit. Section 5-111 in part provides: "(1) Unless otherwise agreed the beneficiary by transferring or presenting a documentary draft or demand for payment warrants to all interested parties that the necessary conditions of the credit have been complied with. This is in addition to any warranties arising under articles 3, 4, 7 and 8." Under § 5-111 the beneficiary warrants that a documented fact has occurred so that the issuer-bank and its customer have a cause of action against the beneficiary if a fact attested has not occurred. Guaranty's demand for payment was based on a fact stated in its letter to U.S.N.B.—Invoil's debt to Guaranty was due and,

therefore, Brown's payment in accordance with the letter of credit was also due. In construing provisions regarding documentation for a letter of credit, we will not demand literal adherence to requirements dictated by the parties at the risk of frustrating the objectives of the Uniform Commercial Code. There is no way U.S.N.B. and Brown could have been misled by Guaranty's wording of its demand for payment. See *Flagship Cruises, Ltd. v. New England Merchants*, 569 F.2d 699 (1st Cir. 1978) (variance in documentation is not fatal if there is no possibility that documents tendered could mislead a paying bank to its detriment). Brown's claim regarding certification is without merit.

We note that the district court, as a part of its judgment, ordered U.S.N.B. to honor the letters of credit to the extent of $55,000. Brown's requested limitation of the amount payable under the letters of credit is in essence a reformation of the letters of credit, namely, a change in the face amount from $70,000 to some lesser amount. Such alteration by reformation is somewhat difficult without the requisite proof for reformation. See *Johnson v. Stover*, 218 Neb. 250, 354 N.W.2d 142 (1984) (reformation available in cases of mutual mistake or unilateral fraud). Moreover, recalling our recognition of a credit engagement's independence of the underlying contract, Brown's attempt to change the terms of the letters of credit must suffer the same fate as Brown's claim of alleged fraud regarding the underlying transaction with Invoil. If Brown is denied relief for alleged fraud involving the underlying contract, Brown must also be denied reformation, under the circumstances, lest the independence between the credit arrangement and underlying contract be negated. Consequently, we find that the district court's judgment regarding the amount to be paid under the letters of credit is incorrect and is reversed with direction to vacate that part of the judgment directing payment. The remainder of the district court's judgment, that is, denial of injunctive relief to Brown, is affirmed.

In view of our disposition we need not consider the cross-appeals of Guaranty and U.S.N.B.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTION.