526 A.2d 591

**MERCANTILE–SAFE DEPOSIT AND TRUST COMPANY**

v.

**BALTIMORE COUNTY, Maryland.**

**No. 151 Sept. Term, 1986.**

Court of Appeals of Maryland.

June 5, 1987.

Diana G. Motz (Shale D. Stiller, Ellen L. Hollander and Frank, Bernstein, Conaway & Goldman, on brief), Baltimore, for appellant.

Michael J. McMahon, Asst. Co. Atty. (Malcolm F. Spicer, Jr., Co. Atty., on brief), Towson, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, COUCH,* McAULIFFE and ADKINS, JJ.

---

* Couch, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

MURPHY, Chief Judge.

This case involves the refusal by an issuer of a letter of credit to honor a call for payment made by the beneficiary of the credit. The question presented is whether the beneficiary's demand for payment must comply strictly with the terms and conditions of the letter of credit or whether substantial compliance will suffice.

## I

Mercantile-Safe Deposit & Trust Company (Mercantile) issued Letter of Credit No. 10447 in the amount of $20,000 on September 17, 1979. The beneficiary of the irrevocable letter of credit was Baltimore County; Mercantile's customer was Z & C, Inc. (Z & C). The credit was to serve as a performance bond for a Baltimore County grading permit issued for a large scale residential development project undertaken by Z & C. The letter of credit authorized Baltimore County to draw on Mercantile upon presentment of a sight draft accompanied by

"[a] certification from the Director of the Department of Permits and Licenses of Baltimore County, Maryland, or the Building's Engineer stating that the permittee, Z & C, Inc., has not complied in accordance with the terms and conditions of Sediment Control Bond Grading Permit No. CGR18868 dated 9/12/77 for property known as Discovery Acres, Section V."

On April 3, 1985, the last day of the fourth extension for presentment,[1] the County submitted a draft in the amount of $20,000, a copy of the letter of credit, and a letter of certification from Ted Zaleski, Jr., the Director of the Baltimore County Department of Permits and Licenses. The certification letter stated:

"This letter will serve as a certification from the Director of Permits and Licenses that I have been informed

---

1. The letter of credit initially was to expire on March 17, 1981. The expiration date was then extended four times—to March 17, 1982, to April 3, 1983, to April 3, 1984, and finally to April 3, 1985.

by Sediment Control inspection personnel that Z & C, Inc. has not complied in accordance with the terms and conditions of Grading Permit 18868. This certification is issued in accordance with Mercantile-Safe Deposit & Trust Company Letter of Credit Number 10447 dated September 17, 1979 and extended to April 3, 1985.

The accompanying sight draft drawn against your Letter of Credit dated September 17, 1979, due to expire April 3, 1985, will complete this transaction."

Mercantile refused to honor the presentment, pointing out several discrepancies between the letter of credit and the letter of certification. These included:

1) The grading permit number in the certification letter read 18868, whereas the number designated in the letter of credit was CGR 18868.

2) The certification letter stated "I have been informed" that Z & C has not complied with the grading permit, whereas the letter of credit required the Director to certify directly, through personal knowledge, not through hearsay, of the lack of compliance.

3) The certification letter did not identify Z & C, Inc. as the permittee.

4) The certification letter did not name the property, Discovery Acres, for which the permit had been issued.

Although attempts were made to cure the defects before the close of business on April 3, 1985—the last day before expiration of the letter of credit—Baltimore County was ultimately unsuccessful and thus its presentment remained dishonored. Mercantile indicated other problems with the presentment in a letter to Baltimore County on April 19, 1985. In addition to the discrepancies initially noted by Mercantile, the certification letter also failed to refer to the property by its section reference, i.e., Section V, as required, and it did not refer to the permit by its full name also as required, i.e., Sediment Control Bond Grading Permit.

Baltimore County sued Mercantile on August 28, 1985 in the Circuit Court for Baltimore County, maintaining that Mercantile wrongfully dishonored the presentment because the certification letter substantially complied with the letter of credit. Mercantile contended that there must be strict, and not merely substantial, compliance with the terms and conditions of the letter of credit. Because the discrepancies between the two documents were so numerous and material, Mercantile claimed that it rightfully dishonored the County's presentment.

After a hearing on the parties' cross motions for summary judgment, the court (DeWaters, J.) held that Baltimore County's presentment had substantially complied with the requirements contained in the credit and that Mercantile had acted improperly in refusing to honor it. The significant issue raised in the case prompted us to grant Mercantile's Petition for writ of certiorari to the Court of Special Appeals before consideration of Mercantile's appeal by the court.

## II

Maryland Code (1975) Title 5 of the Commercial Law Article, in § 5–103(1)(a), defines a letter of credit as

"an engagement by a bank or other person made at the request of a customer and of a kind within the scope of this title (§ 5–102) that the issuer will honor drafts or other demands for payment upon compliance with the conditions specified in the credit. A credit may be either revocable or irrevocable. The engagement may be either an agreement to honor or a statement that the bank or other person is authorized to honor."

The essential parties to the usual letter of credit include: 1) the customer [2], 2) the beneficiary [3], and 3) the issuer of the

---

**2.** Section 5–103(1)(g) states that a customer is "a buyer or other person who causes an issuer to issue a credit. The term also includes a bank which procures issuance or confirmation on behalf of that bank's customer."

**3.** "A 'beneficiary' of a credit is a person who is entitled under its terms to draw or demand payment." § 5–103(1)(d)

credit, usually a bank.[4]  In a typical transaction involving a letter of credit, illustrated by a commercial transaction involving the sale of goods, the parties interact in the following manner:

"Buyer and Seller enter into a contract for the sale of goods.  The agreement includes a term whereby Buyer agrees to establish a letter of credit with a Bank in the amount of the purchase price.  The Bank issues such a credit letter promising to pay Seller upon presentation of a draft and appropriate documents specified in the letter. Seller performs its obligations, and in so doing, gathers the necessary documents, e.g., bills of lading from the carrier, invoices, and inspection certificates.  Seller presents the complying documents and the Bank honors the draft for payment.  Buyer reimburses the Bank, takes the documents to the Carrier, and gets the goods."

Leon, "Letters of Credit:  A Primer," 45 *Md.L.Rev.* 432, 433–34 (1986).

The reasons a seller may insist on using a letter of credit are threefold, yet central to each is the desire to reduce or eliminate the possibility of the buyer's failure to pay.  First, the seller wishes to avoid the risk of disposing of the goods, often in a foreign market, if the buyer proves insolvent or otherwise unable to pay for the merchandise.  Second, a buyer may dishonestly refuse payment, as might occur in order to take advantage of a better bargain from another seller.  Finally, the buyer might honestly dispute payment for a legitimate reason, such as nonconformity of a prior shipment.  *See* J. White & R. Summers, *Uniform Commercial Code* § 18–1, at 705–06 (2d ed. 1980).  The letter of credit transaction between the issuer and the beneficiary/seller is designed to be completely independent of the underlying commercial transaction between the cus-

---

**4.**  Section 5–103(1)(c) similarly defines an issuer as "a bank or other person issuing a credit."

tomer/buyer and the beneficiary/seller. Thus, a letter of credit that pledges the bank's credit, regardless of what transpires in the underlying transaction, satisfies the seller's need for assurance of payment.

Although historically letters of credit were used primarily in international transactions involving the sale of goods, both the forum and the use have since expanded. Today they are used increasingly in domestic transactions and functions as much as a means of "standby" credit as they do of commercial credit. A standby letter of credit serves a purpose similar to that of a guaranty by providing payment to a beneficiary upon default of a party that was obliged to perform. *See* J. Dolan, *The Law of Letters of Credit: Commercial and Standby Credits* ¶ 1.04, at 1–12 to –15 (1984). Thus, in addition to serving as a medium of payment for property sold or services rendered, letters of credit also serve, as in the present case, as a "back up" device against customer default. *See* J. White & R. Summers, *Uniform Commercial Code* § 18–1, at 709 (2d ed. 1980).

The Uniform Commercial Code (UCC) rules governing letters of credit were adopted by this State in 1963 and are contained in Title 5 of the Commercial Law Article. However, § 5–102(3) recognizes that Title 5 is not meant to be an exhaustive list of rules applicable to letters of credit: "This title deals with some but not all of the rules and concepts of letters of credit as such rules or concepts have developed prior to this act or may hereafter develop." According to the Official Comment to § 5–101, the law relating to letters of credit "has been developed in the cases." Official Comment 2 to § 5–102, subsection (3)

> "recognizes that in the present state of the law and variety of practices as to letters of credit, no statute can effectively or wisely codify all the possible law of letters of credit without stultifying further development of this useful financing device. The more important areas not covered by this Title revolve around the question of when documents in fact and in law do or do not comply with the terms of the credit."

The only guidance given to issuers in Title 5 regarding when documents comply with the relevant letters of credit is found in §§ 5–109(2) and 5–114(1). The former states in pertinent part: "An issuer must examine documents with care so as to ascertain that on their face they appear to comply with the terms of the credit...." Section 5–114(1) provides:

"An issuer must honor a draft or demand for payment which complies with the terms of the relevant credit regardless of whether the goods or documents conform to the underlying contract for sale or other contract between the customer and the beneficiary."

■ The UCC's lack of guidelines by which to determine compliance with the terms and conditions of a letter of credit has given rise to two basic standards: the strict compliance test and the substantial compliance test. Under the strict compliance test, the documents offered at the time of presentment must precisely comply with the terms of the letter of credit; any deviation, however slight, allows the issuer to dishonor. The bank's role in applying this standard is purely ministerial; it simply examines the documents presented in light of the requirements of the credit and is not placed in the time-consuming and tenuous position of deciding whether a discrepancy is material. As stated in *Consolidated Aluminum Corp. v. Bank of Virginia,* 544 F.Supp. 386, 395 (D.Md.1982) *aff'd,* 704 F.2d 136 (4th Cir.1983):

"The rule of strict compliance and the ministerial nature of the issuing bank's responsibility to determine whether or not documents presented by the beneficiary conform to the terms and conditions of the letter of credit serve two purposes: (1) providing certainty of payment to the beneficiary and (2) allowing the issuing bank to evaluate precisely its risks under the letter of credit. It is the certainty of payment that gives the letter of credit its unique value as an instrument to secure obligations of all kinds in myriad contexts. By the same token, the fact that the bank's obligation is defined solely by the terms

and conditions of the letter of credit allows the bank to evaluate precisely the extent of the risks involved in its undertaking pursuant to the letter of credit. As both courts and commentators have pointed out, it is this strict construction of letters of credit which gives them their unique usefulness" (footnote omitted).

The strict compliance standard has been applied by the majority of federal jurisdictions. It has been held, for example, that invoices describing goods as "imported acrylic yarn" did not strictly comply with the condition in the letter of credit that it be accompanied, at presentment, by an invoice covering "100% acrylic yarn." *Courtaulds North America, Inc. v. North Carolina Nat'l Bank*, 528 F.2d 802 (4th Cir.1975). The court said:

"This is not a pharisaical or doctrinaire persistence in the principle, but is altogether realistic in the environs of this case; it is plainly the fair and equitable measure. (The defect in description was not superficial but occurred in the statement of the *quality* of the yarn, not a frivolous concern)" (emphasis in the original). *Id.* at 806.

*Bd. of Trade of San Francisco v. Swiss Credit Bank*, 728 F.2d 1241 (9th Cir.1984), likewise adopted the strict compliance test when it held that the beneficiary's partial shipment of the goods in question by air failed to comply with the credit's condition that they be shipped by boat. The court stated:

"The issuer of a letter of credit should not be placed in the position of having to determine whether an unauthorized method of shipment is material. In this instance, whether air shipment would have been considered hazardous by the parties or apt to cause damage to sensitive electronic equipment is not the type of evaluation that should be required in a transaction where promptness and certainty are of the essence. Absent a waiver, an issuer may insist on strict compliance with the terms of a letter of credit" (citations omitted). *Id.* at 1243.

In *Beyene v. Irving Trust Co.*, 762 F.2d 4 (2d Cir.1985), the court held that the bill of lading's misspelling of the name

"Sofan" as "Soran" was a material discrepancy that entitled the bank to refuse to honor the letter of credit. Other federal cases applying the strict compliance standard include *Banque Paribas v. Hamilton Industries Intern.*, 767 F.2d 380 (7th Cir.1985); *Banco Nacional de Desarrollo v. Mellon Bank, N.A.*, 726 F.2d 87 (3d Cir.1984); *Philadelphia Gear Corp. v. Central Bank*, 717 F.2d 230 (5th Cir.1983); *Voest-Alpine Intern. Corp. v. Chase Manhattan Bank*, 707 F.2d 680 (2d Cir.1983); *Chase Manhattan Bank v. Equibank*, 550 F.2d 882 (3d Cir.1977); *Bank of Cochin Ltd. v. Manufacturers Hanover Trust*, 612 F.Supp. 1533 (S.D.N.Y.1985); *AMF Head Sports Wear v. Ray Scott's All–Am. Sports Club*, 448 F.Supp. 222 (D.Ariz.1978); *Dynamics Corp. of Amer. v. Citizens & Southern Nat. Bank*, 356 F.Supp. 991 (N.D.Ga.1973).

The majority of state courts has also followed the strict compliance standard. New York, for example, has long adhered to this test. *See, e.g., United Commodities-Greece v. Fid.Intern.*, 64 N.Y.2d 449, 478 N.E.2d 172, 489 N.Y.S.2d 31 (1985); *Eximetals Corp. v. Pinheiro Guimares, S.A.*, 73 A.D.2d 526, 422 N.Y.S.2d 684 (N.Y.App.Div.1979), *aff'd*, 51 N.Y.2d 865, 414 N.E.2d 399, 433 N.Y.S.2d 1019 (1980); *Anglo-South American Trust Co. v. Uhe*, 261 N.Y. 150, 184 N.E. 741 (1933). Texas has indicated that "[p]roper presentment of a letter of credit occurs when the beneficiary strictly complies with the terms of the letter" (citation omitted). *Westwind Exploration v. Homestate Sav. Ass'n*, 696 S.W.2d 378, 381 (Tex.1985). The court there held that proper presentment had not been made when the beneficiary offered statements showing deliveries over a four-month period whereas the credit covered only a one-month delivery period. In *Bebco Distributors, Inc. v. Farmers & Merchants Bank*, 485 So.2d 330 (Ala.1986), the court affirmed its earlier application of the strict compliance principle (*American Nat'l Bank & Trust Co. v. Banco Nacional de Nicaragua*, 231 Ala. 614, 620, 166 So. 8 (1936)). In *Bebco* the credit stated that the bank "will honor checks against" its customer up to a stated maximum. However,

no such checks were presented by the beneficiary for the bank to honor. The court, therefore, held that Bebco had not complied with the terms and conditions of the credit and had no cause of action against the bank for the amount owing to it. Wyoming recently joined the ranks of the strict compliance majority in *Security State Bank of Basin v. Basin Petro.*, 713 P.2d 1170 (Wyo.1986), where the court stated:

> "We agree with the majority of courts. To adopt a rule which becomes a vehicle for purely subjective judgments as to that which constitutes compliance would be inconsistent with the need to maintain a high level of predictability in commercial transactions. Requirements placed in a letter of credit by the parties must be taken to express the intent of the parties to anticipate compliance with them."

*Id.* at 1172. Other state court decisions following the strict compliance test include *Bank of Southeast v. Jackson*, 413 So.2d 1091 (Ala.1982); *Raiffeisen-Zentralkasse Tirol v. First Nat. Bank*, 671 P.2d 1008 (Colo.Ct.App.1983); *Dubose Steel, Inc. v. Branch Banking & Trust Co.*, 72 N.C.App. 598, 324 S.E.2d 859 (1985); *Lustrelon, Inc. v. Prutscher*, 178 N.J.Super. 128, 428 A.2d 518 (1981).

A minority of jurisdictions has relaxed the standard to that of reasonable or substantial compliance. In *First Nat. Bank of Atlanta v. Wynne*, 149 Ga.App. 811, 256 S.E.2d 383, 386–87 (1979), the court held that there has been compliance with the letter of credit "if from all the documents presented to the issuer by the beneficiary there is substantial compliance with the terms of the letter of credit *and* there is no possibility that the documents submitted could mislead the issuer to its detriment . . ." (emphasis in the original). Similarly, in *Schweibish v. Pontchartrain State Bank*, 389 So.2d 731 (La.Ct.App.1980), the bill of lading referred to "aluminum punchings," whereas the letter of credit referred to "aluminum scrap." The court found the discrepancy insubstantial, stating that it "[could] not conceive of a clearer definition of 'aluminum scrap' than

remnants from punching holes in aluminum." *Id.* at 738. The credit in *First Arlington Nat. Bank v. Stathis,* 90 Ill.App.3d 802, 46 Ill.Dec. 175, 413 N.E.2d 1288 (1981), required an affidavit that demand had been made by payment according to accelerated maturity. The affidavit instead stated that the makers had failed to cure acts of default under the note according to its accelerated maturity; it was, however, accompanied by demand letters to the makers. The court noted that since the documents submitted by the beneficiary were "reasonably compliant" with the terms of the credit, the issuing bank was required to honor the letter of credit. *Id.* 46 Ill.Dec. at 186, 413 N.E.2d at 1299. In *Peoples State Bank of Clay City v. Gulf Oil,* 446 N.E.2d 1358, 1360–61 (Ind.Ct.App.1983), the court stated:

> "As a matter of policy, it seems that if all the essential requirements of a letter of credit are complied with, the integrity of such drafts should not be challenged by technical or inconsequential reasons" (footnote omitted).

*See also Easton Tire Co. v. Farmers & Merchants Bank,* 642 S.W.2d 396 (Mo.Ct.App.1982); *Exchange Mut. Ins. v. Commerce Union Bank,* 686 S.W.2d 913 (Tenn.Ct.App. 1984); *Titanium Metals Corp. of Amer. v. Space Metals, Inc.,* 529 P.2d 431 (Utah 1974).

■ We think the strict compliance test best promotes the purposes of letters of credit. However laudable the equitable considerations underlying the substantial compliance standard may be, "[t]he basic tenets of letter-of-credit law derive from the necessities of the marketplace and not from the aspirations of the cloister." Harfield, "Code, Customs and Conscience in Letter-of-Credit Law," 4 *U.C.C. L.J.* 7, 11 (1971). While we recognize a potential for abuse in a super or hypertechnical application of the strict compliance test, the cases which apply this rule are not so rigid as to permit an issuer to dishonor if it finds, for example, an obvious and immaterial typographical error. Courts will not permit a

bank in such circumstances to use such a discrepancy to protect itself from an insolvent customer or to protect its customer from payment. *See* Leon, "Letters of Credit: A Primer," 45 *Md.L.Rev.* 432, 453 (1986).

Some courts which follow the strict compliance test have tempered the rule by making an allowance for minor human errors. The result is a strict compliance test somewhat less than exact, but nonetheless more restrictive than the substantial compliance standard. In *American Airlines, Inc. v. Federal Deposit Ins.*, 610 F.Supp. 199 (D.C.Kan.1985), the beneficiary presented a sight draft incorrectly numbering the letter of credit as 60391; the accompanying cover letter, however, referred correctly to the credit number as G–301. In concluding that there was no possibility that the bank could have been misled by the documents the beneficiary submitted, the court stated:

"The term 'strict compliance' is not so absolute as FDIC would wish. In a leading decision, the First Circuit explained:

We take as a starting point the substantial body of case law which establishes and supports the general rule that documents submitted incident to a letter of credit are to be strictly construed. This is because international financial transactions rest upon the accuracy of documents rather than on the condition of the goods they represent. But we note some leaven in the loaf of strict construction. Not only does *haec verba* not control absolutely, but some courts now cast their eyes on a wider scene than a single document. We are mindful, also, of the admonition of several legal scholars that the integrity of international transactions (i.e., rigid adherence to material matters) must somehow strike a balance with the requirement of their fluidity (i.e., a reasonable flexibility as to ancillary matters) if the objective of increased dealings to the mutual satisfaction of all interested parties is to be enhanced.

*Banco Espanol de Credito v. State Street Bank & Trust Co.*, 385 F.2d 230, 234 (1st Cir.1967) (citation omitted)." *American Airlines, supra*, 610 F.Supp. at 201–02.

In *Flagship Cruises, Ltd. v. New England Merchants*, 569 F.2d 699 (1st Cir.1978), the credit called for, *inter alia*, the beneficiary's statement that its draft related to an identified agreement; the statement instead said the letter of credit related to the agreement. The court expressly applied the strict compliance test, yet recognized that, "a variance between documents specified and documents submitted is not fatal if there is *no* possibility that the documents could mislead the paying bank to its detriment" (emphasis in the original). *Id.* at 705.

In *Tosco Corp. v. Federal Deposit Ins. Corp.*, 723 F.2d 1242 (6th Cir.1983), the court held that the bank wrongfully dishonored a draft containing a legend endorsed by the drawer instead of by the negotiating bank as the credit required. The letter of credit required that "drafts ... must state 'drawn under Bank of Clarksville Letter of Credit Number 105' thereon by the negotiating bank." Instead, the draft presented read "drawn under Bank of Clarksville, Clarksville, Tennessee letter of Credit No. 105"; moreover, the language was placed on the draft by Tosco, not by the negotiating bank. The court concluded that the strict compliance rule, even if followed in Tennessee, would not warrant dishonor due to the insubstantial nature of the asserted deviations from the credit terms.

The letter of credit at issue in *Brown v. United States Nat. Bank of Omaha*, 220 Neb. 684, 371 N.W.2d 692 (1985), required a statement "certifying that the amount drawn is due...." In the certification letter, however, the beneficiary failed to use the word "certify." After stating with approval the strict compliance test, the court nonetheless determined that the failure to use the word was insignificant. It said that there was "no way" that the issuer could have been misled by the wording of the demand for payment. *Id.* 371 N.W.2d at 701.

And in *Beyene v. Irving Trust Co., supra,* 762 F.2d at 6–7, the court, after stating that it followed the strict compliance standard, acknowledged:

"While some variations in a bill of lading might be so insignificant as not to relieve the issuing or confirming bank of its obligation to pay, ... we agree with the district court that the misspelling in the bill of lading of Sofan's name as 'Soran' was a material discrepancy that entitled Irving to refuse to honor the letter of credit. First, this is not a case where the name intended is unmistakably clear despite what is obviously a typographical error, as might be the case if, for example, 'Smith' were misspelled 'Smithh.' Nor have appellants claimed that in the Middle East 'Soran' would obviously be recognized as an inadvertent misspelling of the surname 'Sofan.' Second, 'Sofan' was not a name that was inconsequential to the document, for Sofan was the person to whom the shipper was to give notice of the arrival of the goods, and the misspelling of his name could well have resulted in his nonreceipt of the goods and his justifiable refusal to reimburse Irving for the credit.... In the circumstances, the district court was entirely correct in viewing the failure of Beyene and NBW to provide documents that strictly complied with the terms of the letter of credit as a failure that entitled Irving to refuse payment" (citation omitted).

## III

■ Given the facts in the instant case, it is readily apparent that Baltimore County's presentment did not strictly comply with Mercantile's letter of credit, nor is the variance in question a mere technical inaccuracy. The number and degree of discrepancies further indicate that Baltimore County failed to meet even the substantial compliance test; the certification letter's failure to name the property for which the permit had been issued, for example, could have misled Mercantile to its detriment had it honored

the credit. Mercantile accordingly was entitled to dishonor the nonconforming presentment.

JUDGMENT REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR ENTRY OF JUDGMENT FOR THE APPELLANT; COSTS TO BE PAID BY APPELLEE.